UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: NINE WEST LBO SECURITIES LITIGATION | No. 20-MD-2941 (JSR) |

MARC S. KIRSCHNER, as Trustee for the NWHI
LITIGATION TRUST, and WILMINGTON SAVINGS
FUND SOCIETY, FSB, as successor indenture trustee for
the 6.875% Senior Notes due 2019, the 8.25% Senior
Notes due 2019, and the 6.125% Senior Notes due 2034 of
Nine West Holdings, Inc.,

                          Plaintiffs,

              -against-

SIDNEY KIMMEL, THE SIDNEY KIMMEL
REVOCABLE INDENTURE OF TRUST, JOHN D.
DEMSEY, MATTHEW H. KAMENS, JAMES A.
MITAROTONDA, BARINGTON COMPANIES EQUITY
PARTNERS, L.P., BARINGTON COMPANIES
INVESTORS, LLC, JEFFREY D. NUECHTERLEIN,
LOWELL W. ROBINSON, JOSEPH T. DONNALLEY,
AIDA TEJERO-DECOLLI, ALLIANZ ASSET
MANAGEMENT OF AMERICA L.P. f/k/a ALLIANZ
GLOBAL INVESTORS OF AMERICA LP, AMERICAN
FAMILY MUTUAL INSURANCE CO., AMERICAN
INTERNATIONAL GROUP INC., AMY RAPAWY,
ANTHEM HEALTH PLANS OF VIRGINIA, INC.,
BARBARA KREGER, BLUECREST CAPITAL
MANAGEMENT LTD., CALVERT VARIABLE
PRODUCTS, INC. (CALVERT VP RUSSELL 2000
SMALL CAP INDEX PORTFOLIO), CHI OPERATING
INVESTMENT PROGRAM, LP, CHRYSLER WORLD
IMI EQUITY INDEX – ND, COMMUNITY
INSURANCE COMPANY, COLLEGE RETIREMENT
EQUITIES FUND (CREF EQUITY INDEX ACCOUNT),
DANIEL FISHMAN, DONNA F. ZARCONE, DREMAN
CONTRARIAN FUNDS (DREMAN CONTRARIAN
SMALL CAP VALUE FUND), EILEEN DUNN,
EMERSON ELECTRIC CO., EQ ADVISORS TRUST
(ATM SMALL CAP MANAGED VOLATILITY
PORTFOLIO), EQ ADVISORS TRUST (EQ/2000
MANAGED VOLATILITY PORTFOLIO), ERIC
DAUWALTER, FRANCES LUKAS, FRANCIS X.

No. 20-cv-4287 (JSR)

**FIRST AMENDED
COMPLAINT**

**JURY TRIAL
DEMANDED**

CLAPS, GABELLI INVESTOR FUNDS INC. (THE )
GABELLI ABC FUND), GABELLI 787 FUND, INC. )
(ENTERPRISE MERGERS AND ACQUISITIONS )
FUND), GEORGE SHARP, GERALD HOOD, GREGG )
MARKS, GREGORY CLARK, HEATHER HARLAN, )
HEATHER ROUSSEL, JAMES CAPIOLA, JAMES )
CHAN, JAMES T. OSTROWSKI, JAMIE CYGIELMAN, )
JANET CARR, JANICE BROWN, JODI G. WRIGHT, )
JOSEPH A. ROSATO, JOSEPH STAFINIAK, )
JPMORGAN SYSTEMATIC ALPHA FUND, )
KATHERINE BUTLER, KATHLEEN NEDOROSTEK )
KASWELL, KBC EQUITY FUND – FALLEN ANGELS, )
KBC EQUITY FUND – LEISURE AND TOURISM, KBC )
EQUITY FUND – STRATEGIC SATELLITES, )
KIMBERLY THOMAS, LARISSA SYGIDA, LINCOLN )
VARIABLE INSURANCE PRODUCTS TRUST (LVIP )
SSGA SMALL-CAP INDEX FUND), LYNNE )
BERNSTOCK, MARY E. BELLE, METROPOLITAN )
LIFE INSURANCE CO, MITCHEL LEVINE, )
MULTIMANAGER SMALL CAP VALUE PORTFOLIO, )
NATIONWIDE MUTUAL FUNDS (NATIONWIDE )
SMALL CAP INDEX FUND), NATIONWIDE MUTUAL )
FUNDS (NATIONWIDE U.S. SMALL CAP VALUE )
FUND), NATIONWIDE VARIABLE INSURANCE )
TRUST (NVIT MULTI-MANAGER SMALL CAP )
VALUE FUND), NATIONWIDE VARIABLE )
INSURANCE TRUST (NVIT SMALL CAP INDEX )
FUND), NATIXIS SA, NICOLETTA PALMA, )
NORMAN R. VEIT, JR., ODIN HOLDINGS LP, )
OPPENHEIMER GLOBAL MULTI STRATEGIES )
FUND, PINEBRIDGE INVESTMENTS LP, PRINCIPAL )
FUNDS INC. (GLOBAL MULTI-STRATEGY FUND), )
PRINCIPAL FUNDS INC. (SMALLCAP VALUE FUND )
II), PRINCIPAL VARIABLE CONTRACTS FUNDS )
INC. (SMALLCAP VALUE ACCOUNT I), PROSHARES )
TRUST (PROSHARES MERGER ETF), )
QUANTITATIVE MASTER SERIES LLC (MASTER )
EXTENDED MARKET INDEX SERIES), RBB FUND, )
INC. (WPG PARTNERS SMALL/MICRO CAP VALUE )
FUND), ROBYN WHITNEY MILLS, ROSA )
GENOVESI, ROY CHAN, ROYCE INSTITUTIONAL, )
LLC (OPPORTUNITY PORTFOLIO), RUSSELL US )
SMALL CAP EQUITY FUND, SCOTT BOWMAN, )
SECURIAN LIFE INSURANCE CO. f/k/a MINNESOTA )
LIFE INSURANCE CO., SEI INSTITUTIONAL )
INVESTMENTS TRUST (SIIT SMALL CAP FUND), )

SEI INSTITUTIONAL MANAGED TRUST (SIMT   )
SMALL CAP VALUE FUND), SHARON HARGER,   )
STEFANI GREENFIELD, STEPHEN C. TROY,   )
STUART WEITZMAN, SUSAN DUFFY,   )
SUSQUEHANNA INTERNATIONAL GROUP LLP,   )
SUZANNE KARKUS, TALCOTT RESOLUTION LIFE   )
INSURANCE CO., TFS CAPITAL LLC, THE   )
ARBITRAGE EVENT-DRIVEN FUND, THE GDL   )
FUND, TIAA-CREF FUNDS, TIAA-CREF FUNDS   )
(TIAA-CREF EQUITY INDEX FUND), TIAA-CREF   )
FUNDS (TIAA-CREF SMALL-CAP BLEND INDEX   )
FUND), TOUCHSTONE FUNDS GROUP TRUST   )
(TOUCHSTONE CREDIT OPPORTUNITIES II FUND   )
f/k/a TOUCHSTONE ARBITRAGE FUND),   )
TOUCHSTONE FUNDS GROUP TRUST   )
(TOUCHSTONE CREDIT OPPORTUNITIES II FUND   )
f/k/a TOUCHSTONE MERGER ARBITRAGE FUND),   )
TWO SIGMA INVESTMENTS LP, UNIFIED SERIES   )
TRUST (SYMONS SMALL CAP INSTITUTIONAL   )
FUND), VALUED ADVISERS TRUST (FOUNDRY   )
PARTNERS FUNDAMENTAL SMALL CAP VALUE   )
FUND), VANGUARD INDEX FUNDS (VANGUARD   )
EXTENDED MARKET INDEX FUND), VANGUARD   )
INDEX FUNDS (VANGUARD SMALL-CAP INDEX   )
FUND), VANGUARD INDEX FUNDS (VANGUARD   )
SMALL-CAP VALUE INDEX FUND), VANGUARD   )
INDEX FUNDS (VANGUARD TOTAL STOCK   )
MARKET INDEX FUND), VANGUARD   )
INSTITUTIONAL INDEX FUNDS (VANGUARD   )
INSTITUTIONAL TOTAL STOCK MARKET INDEX   )
FUND), VANGUARD INSTITUTIONAL TOTAL   )
STOCK MARKET INDEX TRUST, VANGUARD   )
INTERNATIONAL EQUITY INDEX FUNDS   )
(VANGUARD TOTAL WORLD STOCK INDEX   )
FUND), VANGUARD RUSSELL 2000 VALUE INDEX   )
TRUST, VANGUARD SCOTTSDALE FUNDS   )
(VANGUARD RUSSELL 2000 INDEX FUND),   )
VANGUARD SCOTTSDALE FUNDS (VANGUARD   )
RUSSELL 2000 VALUE INDEX FUND), VANGUARD   )
VALLEY FORGE FUNDS (VANGUARD BALANCED   )
INDEX FUND), VANGUARD WORLD FUND   )
(VANGUARD CONSUMER DISCRETIONARY INDEX   )
FUND), WAYNE KULKIN, and ZINE MAZOUZI,   )
   )
                    Defendants.   )
   )
   )

iii

## <u>TABLE OF CONTENTS</u>

*Page*

NATURE OF THE ACTION ........................................................... 1

JURISDICTION AND VENUE ........................................................ 4

PARTIES ........................................................................ 5

BACKGROUND ON JONES GROUP AND THE 2014 TRANSACTION ............................... 23

    A.    The Poor Performance of Jones Group in Advance of the 2014 Transaction.......................................................... 23

    B.    Jones Group Directors and Officers Struggle to Find an Exit Strategy............... 24

    C.    Jones Group Directors and Officers, and Sycamore, Plan a Transaction That Will Benefit Them at the Expense of NWHI and Its Creditors.................... 28

    D.    Jones Group Directors and Officers Allow Sycamore to Reverse-Engineer Its Valuations to Arrive at Desired Valuation Splits between RemainCo and the Carve-Out Businesses ............................................... 31

    E.    Jones Group Management and Sycamore Exaggerate RemainCo's Estimated 2013 EBITDA .............................................. 33

    F.    Jones Group Directors and Officers Stand by as Sycamore Prepares Forecasts Inconsistent with Jones Group's Performance...................... 35

    G.    Jones Group's Directors and Officers Fail to Protect the Company When Sycamore Substitutes More Debt for Equity ........................ 41

    H.    Sycamore Withholds Its Lower "Base Case" Projections from Duff & Phelps, and Duff & Phelps Uses Sycamore's Manipulated "Upside" Projections in Its Solvency Opinion ................................... 46

    I.    A Realistic Analysis Would Have Shown That the 2014 Transaction Would Render NWHI Insolvent ........................................ 49

    J.    The 2014 Transaction Closes.......................................... 50

    K.    RemainCo's Disastrous Post-LBO Performance Corroborates the Contemporaneous Evidence That Sycamore's Projections Were Unrealistic and Unreliable ............................................ 54

L.      Sycamore Takes Dividends from the Carve-Out Businesses Shortly After Closing and Then Resells the Carve-Out Businesses to Third Parties at Massive Profits.................................................................................................. 57

M.      Insolvent NWHI Sinks into Bankruptcy ................................................. 58

COUNT I  Breach of Fiduciary Duty (Against Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley)...................................................................... 60

COUNT II  Aiding and Abetting Breach of Fiduciary Duty (Against Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley)................................... 68

COUNT III  Violation of Title 15, Sections 1551 and 1553 of the Pennsylvania Statutes (Against Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, and Robinson)...................... 70

COUNT IV  Unjust Enrichment (Against Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley)...................................................................... 71

COUNT V  Avoidance and Recovery of the Shareholder Transfers as Constructive Fraudulent Conveyances (Against the Shareholder Defendants) ................................... 72

COUNT VI  Avoidance and Recovery of the Shareholder Transfers  as Intentional Fraudulent Conveyances (Against the Shareholder Defendants) ................................... 73

COUNT VII  Avoidance and Recovery of the Change in Control Payments  as Constructive and Intentional Fraudulent Conveyances (Against the Change in Control Payment Defendants)................................................................................................. 75

PRAYER FOR RELIEF ............................................................................................... 77

JURY TRIAL DEMAND .............................................................................................. 77

Plaintiffs Marc S. Kirschner, as Trustee (the "Litigation Trustee") for the NWHI Litigation Trust (the "Litigation Trust"), and Wilmington Savings Fund Society, FSB, as successor indenture trustee (the "Indenture Trustee") for the 6.875% Senior Notes due 2019, the 8.25% Senior Notes due 2019, and the 6.125% Senior Notes due 2034 of Nine West Holdings, Inc., allege, upon knowledge as to the Litigation Trust and Indenture Trustee and upon information and belief (based on review of documents, deposition testimony, and other materials produced in the Nine West Holdings, Inc. bankruptcy case and additional investigation by Plaintiffs' counsel) as to all other matters:

## NATURE OF THE ACTION

1.       On April 8, 2014, the fashion company The Jones Group Inc. ("Jones Group," or the "Company") consummated a series of transactions that rendered it insolvent. These transactions (collectively, the "2014 Transaction") significantly increased the Company's debt, significantly decreased its assets, distributed more than $1 billion to its shareholders, and rewarded its directors and officers with change-of-control payments and other substantial consideration—all to the detriment of the Company and its creditors.

2.       In the 2014 Transaction, Jones Group:

- merged with a shell company that was an affiliate of private equity sponsor Sycamore Partners Management, L.P. (together with its principals and certain affiliates, "Sycamore");

- sold off its "crown jewel" business units to other affiliates of Sycamore for a fraction of their value;

- saddled the much-diminished remaining company, renamed Nine West Holdings, Inc. ("NWHI"), with more than $1.5 billion in debt—composed of $528 million of new debt in addition to a pre-existing debt balance of $1,022 million—which could not be repaid; and

- distributed approximately $1.2 billion to its shareholders.

3.    A simplified diagram of the 2014 Transaction is set forth below.



4.    The 2014 Transaction was a single integrated transaction; all key aspects closed on April 8, 2014.  As the Jones Group directors and officers knew, the payments to the Jones Group shareholders, directors, and officers could not have occurred independently of all the other aspects of the 2014 Transaction, including the incurrence of the additional debt and the self-dealing asset sales to affiliates of Sycamore, all of which the Jones Group directors and officers helped to implement.  These directors and officers closed their eyes to the fact that the 2014 Transaction would leave NWHI insolvent, inadequately capitalized, and unable to pay its debts.

2

5.      The 2014 Transaction enriched everyone involved except the Company and its creditors.  By the end of the 2014 Transaction, Sycamore had reduced the amount of equity it would invest to acquire NWHI from $395 million to only $120 million, increased the debt load beyond that which was originally contemplated, and stripped away NWHI's crown jewel assets at less than fair value and free from any pre-existing Jones Group debt, all while NWHI's financial performance deteriorated.  Within a short period of time after the closing of the 2014 Transaction, Sycamore generated a profit of approximately half a billion dollars from receipt of dividends and sale of these assets.  Jones Group's directors, officers, and shareholders collectively had walked away with almost $1.2 billion.  By contrast, NWHI was deprived of its prize assets and left with shrinking, low-profit businesses and a huge debt load.

6.      The Jones Group directors and officers breached their fiduciary duties to the Company in advocating for and approving the merger (the "Merger") that was a key step in the 2014 Transaction, in not reassessing the Merger when Sycamore dramatically decreased its equity commitment and simultaneously substantially increased the Company's debt despite ongoing business deterioration, and in advocating for and helping to implement the other aspects of the 2014 Transaction, including selling off valuable assets of the Company at less than fair market value, distributing more than $1 billion to the shareholders, and paying large sums to themselves.

7.      NWHI ultimately filed for bankruptcy on April 6, 2018 in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), inflicting hundreds of millions of dollars of losses on its unsecured creditors.

8.      NWHI's plan of reorganization, confirmed in March 2019, established the NWHI Litigation Trust to pursue certain causes of action on behalf of the NWHI estate.  In this

action, the Litigation Trust, through the Litigation Trustee, seeks to recover damages from Jones Group directors and officers for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and other causes of action, and the Litigation Trust and the Indenture Trustee seek as well to recover the cash distributed to Jones Group shareholders as a fraudulent conveyance.  These claims seek to vindicate the fundamental principles of law that (i) directors and officers of a corporation breach their fiduciary duties when they implement a transaction that renders the corporation insolvent, while enriching themselves and their fellow shareholders; and (ii) the shareholders of a corporation, as its owners, assume the primary risk of the corporation's failure, and thus when the corporation becomes insolvent, the shareholders should be paid only *after* the corporation's creditors are paid, not before, as was the case here.

9.     When the Jones Group directors approved the Merger, and thereafter through the closing, they consciously disregarded their ongoing obligation to determine whether the 2014 Transaction was and remained in the best interests of Jones Group.  Their duty to act in the corporation's best interests—which they failed to do—included protecting Jones Group from transferring corporate assets and incurring corporate obligations when Jones Group would not receive reasonably equivalent value in exchange and would be rendered insolvent.  In implementing the 2014 Transaction, the Jones Group directors and officers were acting in a manner that was contrary to the best interests of the corporation, destructive of the rights and interests of the corporation's creditors, and in their own personal financial interests.

## JURISDICTION AND VENUE

10.     The United States District Court for the Southern District of New York (the "Court") has jurisdiction over this proceeding under 28 U.S.C. § 1334 as it arises under

4

title 11 or arises in or is related to a case under title 11 of the United States Code (the

"Bankruptcy Code").

11.     This Court has personal jurisdiction over the defendants pursuant to

Rule 7004(f) of the Federal Rules of Bankruptcy Procedure as each resides in or has its principal

place of business in the United States, or exercise of jurisdiction is otherwise consistent with the

Constitution and laws of the United States.

12.     Venue in this District is proper under 28 U.S.C. §§ 1391(b)(2) and 1409(c)

because a substantial part of the events or omissions giving rise to the claims occurred in this

District.

## **PARTIES**

13.     Plaintiff Marc S. Kirschner is the Trustee for the NWHI Litigation Trust,

also known as the Non-Released Party Trust, established pursuant to the Debtors' Third

Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (the

"Plan") of NWHI and its debtor affiliates, dated February 27, 2019.

14.     Plaintiff Wilmington Savings Fund Society, FSB, is the successor

indenture trustee under

   a.     that certain indenture (as amended, restated, supplemented, or otherwise modified

           from time to time), dated as of March 7, 2011, among The Jones Group Inc.,

           Jones Apparel Group Holdings, Inc., Jones Apparel Group USA, Inc., and JAG

           Footwear, Accessories and Retail Corporation, as issuers, and Wilmington

           Savings Fund Society, FSB as successor trustee to U.S. Bank National

           Association, for the 6.875% Senior Notes due 2019 (the "Old 2019 Notes");

5

b.     that certain indenture (as amended, restated, supplemented, or otherwise modified

from time to time), dated as of April 23, 2014, between NWHI, as issuer, and

Wilmington Savings Fund Society, FSB as successor trustee to U.S. Bank

National Association, for the 8.25% Senior Notes due 2019 (the "New 2019

Notes"); and

c.     that certain indenture (as amended, restated, supplemented, or otherwise modified

from time to time), dated as of November 22, 2004, among Jones Apparel Group,

Inc. (now known as NWHI), Jones Apparel Group Holdings, Inc., Jones Apparel

Group USA, Inc., Nine West Footwear Corporation, and Jones Retail

Corporation, as issuers, and Wilmington Savings Fund Society, FSB as successor

trustee to U.S. Bank National Association and SunTrust Bank, for the 6.125%

Senior Notes due 2034 (the "2034 Notes").

15.     Under the Plan, the Litigation Trust is the holder of all claims and causes

of action arising under state or federal law owned by, or asserted by or on behalf of, or that may

be asserted by or on behalf of, the NWHI debtors or their estates, in respect of matters arising out

of or relating to the 2014 Transaction against (a) any person or entity that received consideration,

directly or indirectly, in exchange for common stock of Jones Group in connection with the 2014

Transaction and any of their management companies, fund advisors, affiliates, assignees,

participants, or mediate, immediate, or subsequent transferees; (b) directors, officers, or

managers of Jones Group and its subsidiaries and affiliates; and (c) the financial advisors,

attorneys, accountants, investment bankers, consultants, representatives, and other professionals

for Jones Group (collectively, the "Non-Released Party Trust Causes of Action").

6

16.     In addition, subsection (f) of Article IV.L of the Plan authorizes the

Indenture Trustee

> to pursue avoidance, recovery, or similar remedies that may be brought under
> chapter 5 of the Bankruptcy Code or under similar or related state or federal
> statutes or common law, including fraudulent transfer law, solely to the extent
> necessary to pursue such claims against any Person or Entity that received
> consideration, directly or indirectly, in exchange for common stock of The Jones
> Group Inc. in connection with the 2014 Transaction and any of their management
> companies, fund advisors, Affiliates, assignees, participants, or mediate,
> immediate, or subsequent transferees . . . .

17.     Paragraph 12 of the February 27, 2019 order (the "Confirmation Order")

confirming the Plan provides:

> Nothing in the Plan or this Confirmation Order shall preclude . . . the
> simultaneous assertion of the Non-Released Party Trust Causes of Action and any
> of the Causes of Action described in [subsection (f) of Article IV.L of the Plan],
> in joint or separate actions, whenever commenced, by one or more of the Non-
> Released Party Trust, the Indenture Trustees, or creditors of the Debtors that
> received and retained Non-Released Party Trust Interests; *provided* that such
> assertion by the Indenture Trustees or creditors may only be made after receiving
> written approval of the Non-Released Party Trustee [the Litigation Trustee]
> (which may only be granted if, among other things, the Non-Released Party
> Trustee receives unanimous written authorization from the Non-Released Party
> Trust Advisory Board with due consideration of the best interests of all
> beneficiaries of the Non-Released Party Trust); *provided, further*, that no
> defendant that is the subject of the Non-Released Party Trust Causes of Action
> and the Causes of Action described in [subsection (f) of Article IV.L of the Plan]
> shall be required to disgorge the same transfer more than once.

18.     The Non-Released Party Trust Advisory Board gave its unanimous written

authorization, and the Litigation Trustee gave his written approval, of this action by the

Indenture Trustee as of January 9, 2020, and the Bankruptcy Court lifted the automatic stay with

respect to this action by the Indenture Trustee effective January 31, 2020.

19.     In this action, the Litigation Trustee and Indenture Trustee are seeking to

recover the same shareholder transfers from the same recipients of those transfers because

certain defenses that might be asserted as against the Litigation Trustee are not applicable to the

Indenture Trustee, and vice versa.  As provided in the Confirmation Order, no defendant that is

subject to suit by both the Litigation Trustee and the Indenture Trustee shall be required to

disgorge the same transfer more than once.

20. Each of the persons named in paragraphs 21-31 (the "Directors") served as

a member of Jones Group's Board of Directors (the "Board") and voted to approve the Merger

on December 19, 2013 and to recommend it to Jones Group's shareholders for their approval.

Each of the Directors advocated for and facilitated not only the Merger, but the other aspects of

the 2014 Transaction, while knowing that, or recklessly disregarding whether, the 2014

Transaction would leave NWHI insolvent, inadequately capitalized, and unable to pay its debts.

21. Defendant Sidney Kimmel was Chairman of the Board of Directors of

Jones Group.  In addition to holding shares in Jones Group directly, Kimmel held shares through

defendant The Sidney Kimmel Revocable Indenture of Trust.

22. Nonparty Wesley R. Card served as Jones Group's Chief Executive

Officer and as a director of Jones Group.[1]

23. Nonparty Gerald C. Crotty was a director of Jones Group.

24. Defendant John D. Demsey was a director of Jones Group.

25. Nonparty Mary Margaret Hastings Georgiadis was a director of Jones

Group.  In addition to holding shares in Jones Group directly, Georgiadis held shares through

Telendos, LLC.

26. Defendant Matthew H. Kamens was a director of Jones Group.

---

[1] Card and the other nonparty directors and officers of Jones Group listed in paragraphs
22-38 have been named as defendants in other actions that are before this Court for consolidated
pretrial proceedings.

3525876.2

27.     Nonparty Robert L. Mettler was a director of Jones Group and served as its Presiding Independent Director.  In addition to holding shares in Jones Group directly, Mettler held shares through Robert & Susan Mettler Family Trust U/A 3/27/06, Robert L. Mettler, Susan T. Mettler, Trustees.

28.     Defendant James A. Mitarotonda was a director of Jones Group.  He joined the Board in June 2013.  In addition to holding shares in Jones Group directly, Mitarotonda held shares through defendants Barington Companies Equity Partners, L.P. and Barington Companies Investors, LLC (collectively, "Barington").

29.     Defendant Jeffrey Nuechterlein was a director of Jones Group.

30.     Defendant Lowell W. Robinson was a director of Jones Group.

31.     Nonparty Ann Marie C. Wilkins was a director of Jones Group.

32.     Card and each of the persons named in paragraphs 33-38 (collectively, the "Officers") advocated for and facilitated not only the Merger, but the other aspects of the 2014 Transaction, while knowing that, or recklessly disregarding whether, the 2014 Transaction would leave NWHI insolvent, inadequately capitalized, and unable to pay its debts.

33.     Nonparty Christopher R. Cade served as Executive Vice President, Chief Accounting Officer, and Controller of Jones Group.

34.     Nonparty Ira M. Dansky served as Executive Vice President, General Counsel, and Secretary of Jones Group.  In addition to holding shares in Jones Group directly, Dansky held shares through Ira Martin Dansky Revocable Trust.

35.     Nonparty Richard L. Dickson served as President and Chief Executive Officer – Branded Businesses of Jones Group.

9

36.     Defendant Joseph T. Donnalley served as Jones Group's Treasurer and Executive Vice President, Corporate Tax and Risk Management.

37.     Nonparty Tami Fersko served as Jones Group's Executive Vice President, Financial Operations.

38.     Nonparty John T. McClain served as Jones Group's Chief Financial Officer.

39.     The Directors and Officers had interests in the 2014 Transaction that were different from and in addition to those of Jones Group's shareholders generally, and different from those of Jones Group's creditors.  In particular, the 2014 Transaction triggered (a) acceleration of the vesting of Restricted Shares and/or Share Equivalent Units held by each of the Directors and Officers and the cancellation and conversion of those shares into the right to receive $15 per share in cash; (b) acceleration of the award of Restricted Shares to the Officers and/or the Directors under Jones Group's Long Term Incentive Plan at a level assuming maximum achievement of all applicable performance goals, and the cancellation and conversion of those shares into the right to receive $15 per share in cash; (c) the receipt of payments and benefits under the Officers' employment agreements upon termination of their employment, including a lump-sum payment equal to three to six times each Officer Defendant's annual base salary; and (d) entitlement to indemnification benefits.

40.     Accordingly, each of the Directors and Officers had a substantial monetary incentive to approve and/or facilitate the 2014 Transaction.  First, all the Directors and Officers knew that they would receive, individually or through family members, affiliated entities, or trusts, material amounts from the cancellation of Jones Group shares in connection with the LBO.  Second, all the Officers (except for Cade) knew they would or could receive

material amounts in additional compensation through "Change in Control Payments" if the 2014

Transaction was consummated.  The breakdown of the more than $79 million the Directors and

Officers received in connection with the 2014 Transaction was as follows:

| Name | Amount Received from Common Shares Cancelled in LBO | Amount Received from Restricted Shares Cancelled in LBO (and Accumulated Dividends) | Additional Compensation Triggered by 2014 Transaction | Totals |
|---|---|---|---|---|
| *Directors* | | | | |
| Card (also CEO) | $4,978,620 | $11,873,292 | $9,957,775 | $26,809,687 |
| Crotty | 1,150,830 | 434,093 | | 1,584,923 |
| Demsey | 273,885 | 204,690 | | 478,575 |
| Georgiadis | 1,003,830 | 239,020 | | 1,242,850 |
| Kamens | 925,830 | 139,020 | | 1,064,850 |
| Kimmel | 125,805 | 139,020 | | 264,825 |
| Mettler | 1,003,830 | 139,020 | | 1,142,850 |
| Mitarotonda | 4,089,570 | 154,845 | | 4,244,415 |
| Neuchterlein | 348,885 | 204,690 | | 553,575 |
| Robinson | 114,330 | 139,020 | | 253,350 |
| Wilkins | 307,905 | 204,690 | | 512,595 |
| *Officers* | | | | |
| Cade | | 820,301 | 1,236,000 | 2,056,301 |
| Dansky | 1,013,340 | 2,077,821 | 4,369,282 | 7,460,443 |
| Dickson | 2,216,445 | 9,221,607 | 6,868,904 | 18,306,956 |
| Donnalley | | 517,289 | 1,080,000 | 1,597,289 |
| Fersko | 408,060 | 1,243,912 | 1,404,000 | 3,055,972 |
| McClain | 2,213,970 | 2,894,119 | 4,048,185 | 9,156,274 |
| **Totals** | **$20,175,135** | **$30,646,449** | **$28,964,146** | **$79,785,730** |

41.     The defendants (the "Shareholder Defendants") are among those who

received transfers (the "Shareholder Transfers") in connection with the cancellation of Jones

Group stock (including Common Shares, Restricted Shares, Share Equivalent Units, and

accumulated unpaid dividends on Restricted Shares) as a result of the LBO.  The Shareholder

Defendants received at least the Shareholder Transfers shown in the table below.

11

| Defendant | Residence or Principal Place of Business | Common Shares Cancelled in LBO | Restricted Shares and/or Share Equivalent Units | Accumulated Unpaid Dividends on Restricted Shares | Total Shareholder Transfers |
|---|---|---|---|---|---|
| Sidney Kimmel | New York, NY | | $139,020.00 | | **$139,020.00** |
| The Sidney Kimmel Revocable Indenture of Trust | New York, NY | $125,805.00 | | | **125,805.00** |
| John D. Demsey | New York, NY | 273,885.00 | 204,690.00 | | **478,575.00** |
| Matthew H. Kamens | Rosemont, PA | 925,830.00 | 139,020.00 | | **1,064,850.00** |
| James A. Mitarotonda | New York, NY | | 154,845.00 | | **154,845.00** |
| Barington Companies Equity Partners, L.P. | New York, NY | 3,904,500.00 | | | **3,904,500.00** |
| Barington Companies Investors, LLC | New York, NY | 185,070.00 | | | **185,070.00** |
| Jeffrey D. Nuechterlein | Alexandria, VA | 348,885.00 | 204,690.00 | | **553,575.00** |
| Lowell W. Robinson | New York, NY | 114,330.00 | 139,020.00 | | **253,350.00** |
| Joseph T. Donnalley | Maple Glen, PA | | 506,775.00 | $10,514.00 | **517,289.00** |
| Aida Tejero-DeColli | Jamison, PA | | 1,391,535.00 | 28,357.60 | **1,419,892.60** |
| Allianz Asset Management of America L.P. f/k/a Allianz Global Investors of America LP (previously named herein as Allianz Global Investors of America LP) | New York, NY | 2,500,200.00 | | | **2,500,200.00** |

12

| Defendant | Residence or Principal Place of Business | Common Shares Cancelled in LBO | Restricted Shares and/or Share Equivalent Units | Accumulated Unpaid Dividends on Restricted Shares | Total Shareholder Transfers |
|---|---|---|---|---|---|
| American Family Mutual Insurance Co. | Madison, WI | 172,950.00 | | | **172,950.00** |
| American International Group Inc. | New York, NY | 816,915.00 | | | **816,915.00** |
| Amy Rapawy | Weston, CT | 7,500.00 | 180,000.00 | | **187,500.00** |
| Anthem Health Plans of Virginia, Inc. | Rego Park, NY | 201,000.00 | | | **201,000.00** |
| Barbara Kreger | New York, NY | | 420,000.00 | | **420,000.00** |
| BlueCrest Capital Management Ltd. | New York, NY | 552,915.00 | | | **552,915.00** |
| Calvert Variable Products, Inc. (Calvert VP Russell 2000 Small Cap Index Portfolio) | Washington, DC | 103,605.00 | | | **103,605.00** |
| CHI Operating Investment Program, LP | Englewood, CO | 166,845.00 | | | **166,845.00** |
| Chrysler World IMI Equity Index – ND | Detroit, MI | 117,135.00 | | | **117,135.00** |
| Community Insurance Company | Rego Park, NY | 162,000.00 | | | **162,000.00** |
| College Retirement Equities Fund (CREF Equity Index Account) (previously named herein as CREF Equity Index Account) | New York, NY | 947,640.00 | | | **947,640.00** |
| Daniel Fishman | New York, NY | | 180,000.00 | | **180,000.00** |

13

| Defendant | Residence or Principal Place of Business | Common Shares Cancelled in LBO | Restricted Shares and/or Share Equivalent Units | Accumulated Unpaid Dividends on Restricted Shares | Total Shareholder Transfers |
|---|---|---|---|---|---|
| Donna F. Zarcone | Bloomfield, CT | 508,800.00 | | | **508,800.00** |
| Dreman Contrarian Funds (Dreman Contrarian Small Cap Value Fund) | Cincinnati, OH | 1,209,420.00 | | | **1,209,420.00** |
| Eileen Dunn | Jenkintown, PA | | 105,000.00 | | **105,000.00** |
| Emerson Electric Co. | St. Louis, MO | 926,112.39 | | | **926,112.39** |
| EQ Advisors Trust (ATM Small Cap Managed Volatility Portfolio) | New York, NY | 235,365.00 | | | **235,365.00** |
| EQ Advisors Trust (EQ/2000 Managed Volatility Portfolio) | New York, NY | 1,169,235.00 | | | **1,169,235.00** |
| Eric Dauwalter | Washington Depot, CT | | 255,000.00 | | **255,000.00** |
| Frances Lukas | New York, NY | | 662,625.00 | 13,807.40 | **676,432.40** |
| Francis X. Claps | New York, NY | 330,000.00 | | | **330,000.00** |
| Gabelli Investor Funds Inc. (The Gabelli ABC Fund) | Rye, NY | 4,951,245.00 | | | **4,951,245.00** |
| Gabelli 787 Fund, Inc. (Enterprise Mergers and Acquisitions Fund) | Rye, NY | 300,000.00 | | | **300,000.00** |
| George Sharp | New York, NY | | 195,000.00 | | **195,000.00** |

14

| Defendant | Residence or Principal Place of Business | Common Shares Cancelled in LBO | Restricted Shares and/or Share Equivalent Units | Accumulated Unpaid Dividends on Restricted Shares | Total Shareholder Transfers |
|---|---|---|---|---|---|
| Gerald Hood | Starksville, MS | | 180,000.00 | | **180,000.00** |
| Gregg Marks | Briarcliff Manor, NY | | 3,140,055.00 | 65,734.80 | **3,205,789.80** |
| Gregory Clark | Lewistown, MT | | 375,000.00 | | **375,000.00** |
| Heather Harlan | Montclair, NJ | 72,150.00 | 135,000.00 | | **207,150.00** |
| Heather Roussel | Brooklyn, NY | | 276,000.00 | | **276,000.00** |
| James Capiola | West Harrison, NY | | 105,000.00 | | **105,000.00** |
| James Chan | Jersey City, NJ | | 105,000.00 | | **105,000.00** |
| James T. Ostrowski | Langhorne, PA | 86,940.00 | 180,000.00 | | **266,940.00** |
| Jamie Cygielman | New York, NY | | 180,000.00 | | **180,000.00** |
| Janet Carr | Fort Worth, TX | | 450,000.00 | | **450,000.00** |
| Janice Brown | New York, NY | | 157,500.00 | | **157,500.00** |
| Jodi G. Wright | Bronxville, NY | 126,720.00 | 145,500.00 | | **272,220.00** |
| Joseph A. Rosato | Westport, CT | 93,615.00 | 165,000.00 | | **258,615.00** |
| Joseph Stafiniak | Hillsdale, NY | | 300,000.00 | | **300,000.00** |
| JPMorgan Systematic Alpha Fund | New York, NY | 17,538,030.00 | | | **17,538,030.00** |
| Katherine Butler | Greenwich, CT | | 330,000.00 | | **330,000.00** |
| Kathleen Nedorostek Kaswell | New York, NY | | 4,140,045.00 | 47,834.25 | **4,187,879.25** |
| KBC Equity Fund – Fallen Angels | New York, NY | 533,715.00 | | | **533,715.00** |

15

| Defendant | Residence or Principal Place of Business | Common Shares Cancelled in LBO | Restricted Shares and/or Share Equivalent Units | Accumulated Unpaid Dividends on Restricted Shares | Total Shareholder Transfers |
|---|---|---|---|---|---|
| KBC Equity Fund – Leisure and Tourism | New York, NY | 598,890.00 | | | **598,890.00** |
| KBC Equity Fund – Strategic Satellites | New York, NY | 745,770.00 | | | **745,770.00** |
| Kimberly Thomas | Hatfield, PA | 175,650.00 | 135,000.00 | | **310,650.00** |
| Larissa Sygida | Stamford, CT | 56,730.00 | 405,000.00 | | **461,730.00** |
| Lincoln Variable Insurance Products Trust (LVIP SSgA Small-Cap Index Fund) | Radnor, PA | 853,800.00 | | | **853,800.00** |
| Lynne Bernstock | New York, NY | 61,515.00 | 180,000.00 | | **241,515.00** |
| Mary E. Belle | New York, NY | | 1,157,115.00 | 24,129.80 | **1,181,244.80** |
| Metropolitan Life Insurance Co | New York, NY | 359,520.00 | | | **359,520.00** |
| Mitchel Levine | New York, NY | | 108,750.00 | | **108,750.00** |
| Multimanager Small Cap Value Portfolio | New York, NY | 215,880.00 | | | **215,880.00** |
| Nationwide Mutual Funds (Nationwide Small Cap Index Fund) | Columbus, OH | 554,400.00 | | | **554,400.00** |
| Nationwide Mutual Funds (Nationwide U.S. Small Cap Value Fund) | Columbus, OH | 237,615.00 | | | **237,615.00** |

3525876.2

| Defendant | Residence or Principal Place of Business | Common Shares Cancelled in LBO | Restricted Shares and/or Share Equivalent Units | Accumulated Unpaid Dividends on Restricted Shares | Total Shareholder Transfers |
|---|---|---|---|---|---|
| Nationwide Variable Insurance Trust (NVIT Multi-Manager Small Cap Value Fund) | Columbus, OH | 664,500.00 | | | **664,500.00** |
| Nationwide Variable Insurance Trust (NVIT Small Cap Index Fund) | Columbus, OH | 368,910.00 | | | **368,910.00** |
| Natixis SA | New York, NY | 754,500.00 | | | **754,500.00** |
| Nicoletta Palma | Manhasset, NY | 80,235.00 | 180,000.00 | | **260,235.00** |
| Norman R. Veit, Jr. | Doylestown, PA | 282,330.00 | 843,885.00 | 16,933.40 | **1,143,148.40** |
| Odin Holdings LP | Kings Park, NY | 675,000.00 | | | **675,000.00** |
| Oppenheimer Global Multi Strategies Fund | Centennial, CO | 210,060.00 | | | **210,060.00** |
| PineBridge Investments LP | New York, NY | 15,504,000.00 | | | **15,504,000.00** |
| Principal Funds Inc. (Global Multi-Strategy Fund) | Des Moines, IA | 751,695.00 | | | **751,695.00** |
| Principal Funds Inc. (SmallCap Value Fund II) | Des Moines, IA | 3,220,725.00 | | | **3,220,725.00** |
| Principal Variable Contracts Funds Inc. (SmallCap Value Account I) | Des Moines, IA | 190,815.00 | | | **190,815.00** |
| ProShares Trust (ProShares Merger ETF) | Bethesda, MD | 100,125.00 | | | **100,125.00** |

17

| Defendant | Residence or Principal Place of Business | Common Shares Cancelled in LBO | Restricted Shares and/or Share Equivalent Units | Accumulated Unpaid Dividends on Restricted Shares | Total Shareholder Transfers |
|---|---|---|---|---|---|
| Quantitative Master Series LLC (Master Extended Market Index Series) | Wilmington, DE | 169,785.00 | | | **169,785.00** |
| RBB Fund, Inc. (WPG Partners Small/Micro Cap Value Fund) | New York, NY | 232,500.00 | | | **232,500.00** |
| Robyn Whitney Mills | Rockville Centre, NY | | 105,000.00 | | **105,000.00** |
| Rosa Genovesi | West Haven, CT | 35,730.00 | 120,000.00 | | **155,730.00** |
| Roy Chan | Brooklyn, NY | | 570,000.00 | 4,600.00 | **574,600.00** |
| Royce Institutional, LLC (Opportunity Portfolio) | New York, NY | 1,353,000.00 | | | **1,353,000.00** |
| Russell US Small Cap Equity Fund | Seattle, WA | 3,436,050.00 | | | **3,436,050.00** |
| Scott Bowman | New York, NY | | 3,140,055.00 | 53,801.10 | **3,193,856.10** |
| Securian Life Insurance Co. f/k/a Minnesota Life Insurance Co. | St. Paul, MN | 254,625.00 | | | **254,625.00** |
| SEI Institutional Investments Trust (SIIT Small Cap Fund) | Oaks, PA | 162,000.00 | | | **162,000.00** |
| SEI Institutional Managed Trust (SIMT Small Cap Value Fund) | Oaks, PA | 183,000.00 | | | **183,000.00** |
| Sharon Harger | Hulmeville, PA | 11,850.00 | 210,000.00 | | **221,850.00** |
| Stefani Greenfield | New York, NY | | 727,185.00 | 35,448.60 | **762,633.60** |

18

| Defendant | Residence or Principal Place of Business | Common Shares Cancelled in LBO | Restricted Shares and/or Share Equivalent Units | Accumulated Unpaid Dividends on Restricted Shares | Total Shareholder Transfers |
|---|---|---|---|---|---|
| Stephen C. Troy | Levittown, PA | 315,000.00 | 105,000.00 | | **420,000.00** |
| Stuart Weitzman | Greenwich, CT | | 1,705,590.00 | 22,741.20 | **1,728,331.20** |
| Susan Duffy | Bedford, NY | | 150,000.00 | | **150,000.00** |
| Susquehanna International Group LLP | Bala Cynwyd, PA | 5,400,070.19 | | | **5,400,070.19** |
| Suzanne Karkus | New York, NY | | 225,000.00 | | **225,000.00** |
| Talcott Resolution Life Insurance Co. | Windsor, CT | 168,405.00 | | | **168,405.00** |
| TFS Capital LLC | Richmond, VA | 2,316,915.00 | | | **2,316,915.00** |
| The Arbitrage Event-Driven Fund | New York, NY | 1,581,585.00 | | | **1,581,585.00** |
| The GDL Fund | Rye, NY | 1,350,000.00 | | | **1,350,000.00** |
| TIAA-CREF Funds | New York, NY | 7,394,520.00 | | | **7,394,520.00** |
| TIAA-CREF Funds (TIAA-CREF Equity Index Fund) | New York, NY | 437,730.00 | | | **437,730.00** |
| TIAA-CREF Funds (TIAA-CREF Small-Cap Blend Index Fund) | New York, NY | 1,219,575.00 | | | **1,219,575.00** |

19

| Defendant | Residence or Principal Place of Business | Common Shares Cancelled in LBO | Restricted Shares and/or Share Equivalent Units | Accumulated Unpaid Dividends on Restricted Shares | Total Shareholder Transfers |
|---|---|---|---|---|---|
| Touchstone Funds Group Trust (Touchstone Credit Opportunities II Fund f/k/a Touchstone Arbitrage Fund) (previously named herein as Touchstone Funds Group Trust (Touchstone Arbitrage Fund)) | Cincinnati, OH | 3,099,975.00 | | | **3,099,975.00** |
| Touchstone Funds Group Trust (Touchstone Credit Opportunities II Fund f/k/a Touchstone Merger Arbitrage Fund) (previously named herein as Touchstone Funds Group Trust (Touchstone Merger Arbitrage Fund)) | Cincinnati, OH | 6,991,575.00 | | | **6,991,575.00** |
| Two Sigma Investments LP | New York, NY | 1,910,640.00 | | | **1,910,640.00** |
| Unified Series Trust (Symons Small Cap Institutional Fund) | Pittsburgh, PA | 106,500.00 | | | **106,500.00** |

20

| Defendant | Residence or Principal Place of Business | Common Shares Cancelled in LBO | Restricted Shares and/or Share Equivalent Units | Accumulated Unpaid Dividends on Restricted Shares | Total Shareholder Transfers |
|---|---|---|---|---|---|
| Valued Advisers Trust (Foundry Partners Fundamental Small Cap Value Fund) | Minneapolis, MN | 1,209,420.00 | | | **1,209,420.00** |
| Vanguard Index Funds (Vanguard Extended Market Index Fund) | Malvern, PA | 10,465,875.00 | | | **10,465,875.00** |
| Vanguard Index Funds (Vanguard Small-Cap Index Fund) | Malvern, PA | 19,422,225.00 | | | **19,422,225.00** |
| Vanguard Index Funds (Vanguard Small-Cap Value Index Fund) | Malvern, PA | 9,844,815.00 | | | **9,844,815.00** |
| Vanguard Index Funds (Vanguard Total Stock Market Index Fund) | Malvern, PA | 17,519,745.00 | | | **17,519,745.00** |
| Vanguard Institutional Index Funds (Vanguard Institutional Total Stock Market Index Fund) | Malvern, PA | 2,087,115.00 | | | **2,087,115.00** |
| Vanguard Institutional Total Stock Market Index Trust | Malvern, PA | 404,010.00 | | | **404,010.00** |

21

| *Defendant* | *Residence or Principal Place of Business* | *Common Shares Cancelled in LBO* | *Restricted Shares and/or Share Equivalent Units* | *Accumulated Unpaid Dividends on Restricted Shares* | *Total Shareholder Transfers* |
|---|---|---|---|---|---|
| Vanguard International Equity Index Funds (Vanguard Total World Stock Index Fund) | Malvern, PA | 118,500.00 | | | **118,500.00** |
| Vanguard Russell 2000 Value Index Trust | Malvern, PA | 1,178,625.00 | | | **1,178,625.00** |
| Vanguard Scottsdale Funds (Vanguard Russell 2000 Index Fund) | Malvern, PA | 502,485.00 | | | **502,485.00** |
| Vanguard Scottsdale Funds (Vanguard Russell 2000 Value Index Fund) | Malvern, PA | 206,985.00 | | | **206,985.00** |
| Vanguard Valley Forge Funds (Vanguard Balanced Index Fund) | Malvern, PA | 645,750.00 | | | **645,750.00** |
| Vanguard World Fund (Vanguard Consumer Discretionary Index Fund) | Malvern, PA | 579,735.00 | | | **579,735.00** |
| Wayne Kulkin | Jackson, WY | | 4,603,125.00 | 11,375.00 | **4,614,500.00** |
| Zine Mazouzi | New Fairfield, CT | | 120,000.00 | | **120,000.00** |

42.    Nonparty Stefan Kaluzny is a co-founder and managing director of Sycamore and executed the Merger Agreement on behalf of the Sycamore-affiliated parties to the Merger Agreement.  As discussed in more detail below, Kaluzny also executed the purchase

22

agreements that allowed Sycamore—with the assistance of Jones Group's officers and directors—to sell to its affiliates several of Jones Group's most valuable businesses for a fraction of their true value.  Upon the closing of the 2014 Transaction, Kaluzny became one of the two directors of NWHI and held that position until his resignation in September 2018.

43.    Nonparty Peter Morrow is a co-founder and managing director of Sycamore.  He executed the same purchase agreements as Kaluzny, with Kaluzny representing the Sycamore-affiliated seller, and Morrow representing the Sycamore-affiliated buyers.  Like Kaluzny, upon the closing of the 2014 Transaction, Morrow became one of the two directors of NWHI and held that position until his resignation in September 2018.

44.    At all times relevant to this complaint, Jones Group, which was incorporated in Pennsylvania, and NWHI, which was incorporated in Delaware, had their principal executive office, principal corporate office, and principal place of business at 1411 Broadway, New York, New York, and thus resided in New York.

## BACKGROUND ON JONES GROUP AND THE 2014 TRANSACTION

A.    **The Poor Performance of Jones Group in Advance of the 2014 Transaction**

45.    Prior to the 2014 Transaction, Jones Group had been a publicly-traded company predominantly focused on a wholesale footwear and apparel business selling such brands as Nine West, Anne Klein, and Gloria Vanderbilt to retailers like Macy's, Lord & Taylor, and Walmart/Sam's Club.  Mid-tier footwear and apparel businesses like Jones Group faced a challenging economic environment in 2012 and 2013.  Analysts predicted that these challenges would continue into 2014 and, in fact, the performance of mid-tier footwear and apparel retailers continued to trend downwards during 2014.

46.    In the years and months leading up to the 2014 Transaction, Jones Group performed poorly, repeatedly missing its own forecasts and budgets.  While the Company

projected annual growth of between 4% and 6% from 2011 to 2013, revenue in those years was flat, and Jones Group missed its internal earnings per share targets by 33% in 2011, 9% in 2012, and 25% in 2013.  Retail operations were faltering during that time period, with the net store count decreasing by 199 stores, a 39% reduction.

47.     Jones Group's EBITDA (earnings before interest, taxes, depreciation, and amortization) fell from $340 million in 2010 to $299 million in 2011, to $294 million in 2012, and was projected to fall even further, to $254 million in 2013—a decline in EBITDA from 2010 to 2013 of more than 25%.  Over the same period, EBITDA margins also declined from 9.3% in 2010 to a projected 6.7% in 2013.  In four of the six years leading up to the 2014 Transaction, Jones Group had net losses.

**B.     Jones Group Directors and Officers Struggle to Find an Exit Strategy**

48.     In July 2012, the Jones Group Board engaged Citigroup Global Markets Inc. ("Citigroup") to advise it in evaluating strategic alternatives, including the sale of all or part of its business.  Citigroup recognized that Jones Group was a "challenged asset, and it was not clear that anyone could create value from this business."

49.     In early 2013, management reported to the Jones Group Board that Jones Group would record earnings below analyst consensus estimates for the first quarter of 2013, as well as below then-current full-year guidance numbers.

50.     In March 2013, Mitarotonda, one of the Company's largest shareholders, contacted CEO Card and began to press the Jones Group Board to sell parts of the company, reduce costs, and add new directors.  In an April 9, 2013 letter to the Board, Mitarotonda "recommend[ed] that the proceeds from the sale of any brands be used to pay down debt and invest in the Company's core and emerging brands," which he identified as including the Stuart

Weitzman brand ("Stuart Weitzman") and Kurt Geiger brand ("Kurt Geiger").  After entering

into a settlement and standstill agreement with Jones Group in May 2013, Mitarotonda joined the

Jones Group Board.

51.     In April 2013, Jones Group publicly announced restructuring actions,

including a plan to close approximately 170 underperforming domestic retail stores by mid-2014.

52.     In or around April 2013, senior Jones Group management fielded calls

from third parties indicating an interest in exploring potential transactions to purchase all or a

portion of the Company.  One of those calls was from private equity sponsor Sycamore.

53.     Beginning in June 2013, Citigroup contacted ten financial and strategic

parties, including Sycamore, that Citigroup identified as being potentially interested in a

transaction involving the sale of all or part of Jones Group.   Following media reports on July 5,

2013 that Jones Group was in the early stages of a sale process, Jones Group received additional

indications of potential interest in a strategic transaction, bringing the total number of potentially

interested parties to at least sixteen.  Potential bidders were given access to a Citigroup

presentation containing detailed confidential financial information and projections for Jones

Group.

54.     In July 2013, Sycamore partnered with Kohlberg Kravis Roberts & Co.

L.P. ("KKR," and together with Sycamore, the "Sponsors") to submit an indication of interest to

purchase all of Jones Group for a price of $18 to $20 per share, implying a total enterprise value

of between $2.4 billion and $2.6 billion.  But, when Sycamore and KKR gained access to

additional Jones Group internal documents via a Jones Group virtual data room, their interest in

proceeding with a deal in that price range faltered.

55.     On September 16, 2013, KKR and Sycamore advised Citigroup that after their "extensive additional diligence" they had "considerable reservations regarding the value of the Company," and that if they made a final proposal at all it would be "significantly lower" than the $18 to $20 per share they had indicated previously. Soon thereafter, KKR advised that it was no longer interested in being a 50-50 equity investor with Sycamore in a purchase of Jones Group, and ultimately contributed less than 10% of the investment.

56.     During that same time, skepticism regarding Jones Group's prospects was widespread. In the summer of 2013, for example, one analyst report expressed doubt that "initiatives in place can meaningfully improve the operating performance" of Jones Group, and "encourage[ed] investors to reduce positions." The report recognized that Stuart Weitzman and Kurt Geiger—two bright spots in Jones Group's portfolio of otherwise stagnant or declining brands—could drive margin expansion and international penetration, but worried that Jones Group would be tempted to sell just those businesses, which would leave an unattractive "overall brand portfolio" and "reduce the potential for future sales and growth." Sycamore founder Kaluzny, in an email prior to the 2014 Transaction, agreed with one analyst's assessment that Jones Group's other brands were "crap."

57.     Sycamore indicated its interest in buying just Jones Group's "footwear" business, which included the company's crown jewels—Stuart Weitzman and Kurt Geiger. The Jones Group Board refused, but advised Sycamore that another party, identified in Jones Group's proxy as "Strategic Party C," had expressed interest in acquiring Jones Group's "apparel" business, and encouraged Sycamore to partner with Strategic Party C in a transaction that would include a sale of the entire company. Thereafter, Sycamore and Strategic Party C performed further diligence, including review of additional confidential financial information.

58.     On October 23, 2013, Strategic Party C, like every other party except Sycamore, told the Jones Group Board that it was no longer interested in pursuing a transaction for the entirety of Jones Group, citing execution risk and value-destructive separation costs associated with Sycamore's plan to break up Jones Group into several smaller businesses.  That same day, Sycamore offered to acquire Jones Group for $14 per share, which it later increased to $15 per share, reflecting an enterprise value of $2.15 billion.  During a meeting on October 29, 2013, the Jones Group Board determined that $15 per share "represented a compelling value for the Company" and resolved to "proceed with discussions with Sycamore on that basis."  While Sycamore requested exclusivity, the Jones Group Board refused so that Jones Group "would remain free to consider alternative transactions."  No alternative bid or transaction ever materialized.

59.     Because Sycamore intended to acquire Jones Group primarily with debt, it called on Morgan Stanley & Co. LLC and Morgan Stanley Senior Funding, Inc. (collectively and with their respective affiliates, "Morgan Stanley") to assist with debt financing.  Morgan Stanley began working with Sycamore in the summer of 2013 to present a debt financing structure.

60.     As is typical in an LBO, it was understood by all—including the Directors and Officers—that the new debt being incurred to make the payments to the Jones Group shareholders, directors, and officers would be an obligation of Jones Group's successor company, not Sycamore.  Thus, as the transaction was being planned, the Jones Group directors and officers participated and assisted Sycamore in arranging the debt financing.  In August 2013, Jones Group management made a presentation to Morgan Stanley.  Between August 2013 and the closing of the 2014 Transaction in April 2014, Jones Group directors and officers provided substantial assistance to Sycamore as Sycamore discussed with Morgan Stanley plans for the

27

LBO and projections of how the post-LBO company would perform, and the structure and

syndication of the term loans that would provide necessary financing for the 2014 Transaction.

**C.     Jones Group Directors and Officers, and Sycamore, Plan a Transaction That Will Benefit Them at the Expense of NWHI and Its Creditors**

61.     The 2014 Transaction involved five integrated components that would all

occur substantially concurrently.

a.     *The Mergers.*  Jones Group would undergo a series of mergers, with the

resulting company (to be renamed NWHI) to be controlled by Sycamore.

b.     *The Sponsor Equity.*  Sycamore and KKR would contribute at least

$395 million in equity to NWHI, which was later reduced to $120 million.

c.     *The Additional Debt.*  NWHI would increase its debt from $1 billion to

$1.2 billion, which was later increased to $1.55 billion.

d.     *The Shareholder Transfers.*  The Jones Group shareholders, which

included Jones Group's director and officers, would be cashed out at $15 per share, for a

total of approximately $1.2 billion.

e.     *The Carve-Out Transactions.*  Shortly before Jones Group's October 29,

2013 board meeting, Kaluzny advised Citigroup that Sycamore intended to transfer

ownership of certain of the Company's businesses—Stuart Weitzman, Kurt Geiger, and

Jones Apparel (collectively, the "Carve-Out Businesses")—to "Sycamore [a]ffiliates

substantially concurrently with the closing of the merger" (such transfers referred to as

the "Carve-Out Transactions").  The integrated Carve-Out Transactions were an essential

component of Sycamore's bid for Jones Group and the promised cash payout for Jones

Group's directors, officers, and shareholders.  But the Carve-Out Transactions transferred

28

some of Jones Group's most valuable assets to Sycamore's affiliates—beyond the reach of Jones Group's creditors—for substantially below fair market value.

62.     By virtue of its agreement with the Jones Group Board, Sycamore was able to negotiate *with itself* the prices the Sycamore affiliates paid for each Carve-Out Business. Each purchase agreement was signed by Sycamore co-founder Kaluzny on behalf of the seller entity and by Sycamore co-founder Morrow on behalf of the buyer entity.  By stripping Jones Group of its most valuable assets—the Carve-Out Businesses—for a fraction of fair value, Sycamore guaranteed that it would profit handsomely from the 2014 Transaction no matter what happened to the post-LBO NWHI, dubbed "RemainCo," and RemainCo's creditors.

63.     The self-dealing by Sycamore, which was enabled and agreed to by the Jones Group Directors and Officers, was a key part of the 2014 Transaction that was necessary to provide substantial payments and unjust enrichment to the Directors, Officers, and Shareholder Defendants.  Without agreeing to allow Sycamore to strip value from Jones Group via the Carve-Out Transactions, the Jones Group directors could not have obtained the $15 per share bid from Sycamore that funded the payments to all the defendants.

64.     The Jones Group Board facilitated and enabled the Carve-Out Transactions to enrich themselves and the Jones Group shareholders to the detriment of Jones Group, NWHI, and their creditors, while, in various Board resolutions and in the Merger Agreement itself, disclaiming any view as to the fairness of those transactions.

65.     Each of the Directors voted to approve the Merger on December 19, 2013, and the Merger Agreement was signed by Dansky on behalf of Jones Group.

66.     The Directors' resolution approving the Merger Agreement purported to exclude the debt and the Carve-Out Transactions from that approval.  But the debt and Carve-

Out Transactions were integral parts of the 2014 Transaction which would have obvious and substantial impact on Jones Group, its successor, NWHI, and the holders of its debt.  The Directors had fiduciary obligations to consider those aspects of the 2014 Transaction.  Given these fiduciary obligations, the Directors could not stick their heads in the sand and decline to assess whether the 2014 Transaction in its entirety—including the layering on of additional debt and the stripping of valuable Jones Group assets as a result of the Carve-Out Transactions—was in the best interests of Jones Group.

67.     The Directors and Officers were privy to the details of the 2014 Transaction.  Even though the resolution purported to exclude the debt and the Carve-Out Transactions from the approval, and the Merger Agreement included provisions that committed Jones Group to assist in NWHI's incurrence of additional debt and execution of the Carve-Out Transactions.

68.     Section 6.14(c) of the Merger Agreement provided:

> Prior to the Closing, the Company [i.e., The Jones Group Inc.] shall, and shall cause its Subsidiaries to, and shall use its reasonable best efforts to cause their respective Representatives to, provide to Parent [i.e., Jasper Parent LLC, a newly formed company created by Sycamore to serve as the holding company for RemainCo], at the Parent's sole expense, all cooperation reasonably requested by Parent in connection with the arrangement and consummation of the Financing (including the satisfaction of the conditions precedent set forth therein) and any alternative financing as set forth in Section 6.14(a) . . . .

The Merger Agreement then went on to list the ways in which such cooperation was required, including assisting with the preparation of presentations and offering documents, participating in meetings, presentations, road shows, due diligence sessions, and drafting sessions, and cooperating with Jasper Parent LLC in the preparation of pro forma financial statements and pro forma adjustments giving effect to the 2014 Transaction—all of which the Directors and Officers in fact did.

30

69.     Moreover, Section 6.17 of the Merger Agreement provided:

Carveout Transaction Matters.  If requested by Parent, at Parent's sole expense, the Company shall provide reasonable cooperation to Parent and Merger Sub [i.e., Jasper Merger Sub Inc., a wholly owned subsidiary of Parent created to effectuate the Merger] in connection with Parent and Merger Sub's review of, planning for and implementation of the Carveout Transactions (including, if requested by Parent, reasonable cooperation so that the closing of the Carveout Transactions and the Closing contemplated by this Agreement can occur and be effected concurrently) . . . .

70.     In addition, various of the Directors and Officers, including at least Card, Dickson, McClain, Dansky, and Cade, participated in rating agency presentations and in the preparation of offering memoranda in connection with the 2014 Transaction.

## D.     Jones Group Directors and Officers Allow Sycamore to Reverse-Engineer Its Valuations to Arrive at Desired Valuation Splits between RemainCo and the Carve-Out Businesses

71.     Sycamore knew that it could purport to justify the low prices it set for the Carve-Out Businesses—and assert that RemainCo was solvent after the 2014 Transaction—only if the great majority of Jones Group's enterprise value was attributed to the RemainCo businesses that would be saddled with debt after the 2014 Transaction, and a much smaller value was attributed to the Carve-Out Businesses being transferred beyond the reach of RemainCo's creditors.  To accomplish this, Sycamore prepared numerous inaccurate projections and valuations of RemainCo and the Carve-Out Businesses.  By March 2014, after Sycamore set RemainCo's debt load and the Sponsors' equity contribution, Sycamore settled on an estimated value of RemainCo of $1.58 billion, which was, quite conveniently, just above the $1.55 billion of debt Sycamore imposed on RemainCo via the 2014 Transaction.

72.     Sycamore's own internal calculations and projections beginning in October 2013—and the incremental shifts in Sycamore's valuations of RemainCo and the Carve-Out Businesses over time, which inexorably moved upward for RemainCo and downward for the

31

Carve-Out Businesses, with the consolidated valuation barely budging—demonstrate that

Sycamore's valuations never reflected reality.

73.     Sycamore's internal valuation dated October 29, 2013—the day the Jones

Group Board first reviewed Sycamore's $15 per share bid—estimated Jones Group's total value

at $2.17 billion, ascribing $1.37 billion of that value to RemainCo, and the remaining

$800 million in aggregate value to the Carve-Out Businesses.

74.     Over the course of the ensuing months, Sycamore prepared one internal

valuation after another in which Sycamore's purported estimates of the value of RemainCo

increased by $210 million and its estimates of the combined value of the Carve-Out Businesses

decreased by $160 million, as shown in the following table (numbers in millions of dollars):

| Date | RemainCo | | | Carve-Out Businesses | | | | Sum of the Parts |
|---|---|---|---|---|---|---|---|---|
| | Foot-wear | Jeans-wear | Total | Weitz-man | Geiger | Appa-rel | Total | |
| 10/29/13 | 965 | 405 | 1,370 | 450 | 175 | 175 | 800 | 2,170 |
| 11/01/13 | 1,005 | 405 | 1,410 | 450 | 175 | 135 | 760 | 2,170 |
| 11/04/13 | 1,100 | 405 | 1,505 | 425 | 150 | 90 | 665 | 2,170 |
| 11/29/13 | 1,140 | 420 | 1,560 | 400 | 150 | 90 | 640 | 2,200 |
| 12/16/13 | n/a | n/a | 1,570 | 385 | 145 | 140 | 670 | 2,240 |
| 1/31/14 | n/a | n/a | 1,570 | 385 | 145 | 130 | 660 | 2,230 |
| 3/5/14 | n/a | n/a | 1,580 | 385 | 135 | 120 | 640 | 2,220 |

75.     By March 2014, Sycamore had pushed up its estimate of RemainCo's

value to $1.58 billion and pushed down its estimate of the value of the Carve-Out Businesses to a

combined $640 million.  Notably, Sycamore was just moving value from one of its pockets to the

other since its estimate of the Company's total value barely budged during this period, increasing

by only $50 million.  In an email just weeks after the 2014 Transaction, KKR correctly

32

recognized that the values attributed to RemainCo and the Carve-Out Businesses by Sycamore were "entirely subjective" and "arbitrary."

76.     Nothing in RemainCo's business or performance between October 2013 and March 2014 justified these increases.  To the contrary, as described below, brand-level results and projections for RemainCo's performance deteriorated during that period, indicating a *decreasing* value for RemainCo.

**E.     Jones Group Management and Sycamore Exaggerate RemainCo's Estimated 2013 EBITDA**

77.     In planning the 2014 Transaction, Sycamore purported to "estimate" how RemainCo and the Carve-Out Businesses might have performed in 2013 had those businesses been operating independently of one another during that year and then adjusted those historical estimates to reflect the expected future impact of certain planned Sycamore restructuring initiatives.  However, in doing so, Sycamore manipulated the earnings ascribed to RemainCo.

78.     Beginning at least as early as October 2013, Sycamore prepared estimates of RemainCo EBITDA for 2013 that used inputs from Jones Group management and from Sycamore itself to adjust the EBITDA calculation upward.  One version of the EBITDA calculation incorporated substantial addbacks provided by Jones Group management purportedly justified by Jones Group's existing restructuring initiatives.  The figures resulting from that version of the calculation were referred to by Jones Group in SEC filings as "Adjusted EBITDA" for 2013.  Sycamore sometimes referred to this calculation as "unadjusted," meaning that Sycamore used Jones Group management's upward Adjusted EBITDA as the starting point for further upward adjustments.  These further adjustments included addbacks or increases to 2013 EBITDA purportedly based on steps Sycamore planned to take in 2014 and 2015 after it took control of RemainCo.  That other version of the EBITDA calculation, incorporating both

33

management's and Sycamore's upward adjustments to 2013 EBITDA, was referred to by Jones

Group in SEC filings as "Pro Forma Adjusted EBITDA."

79.     In a valuation dated October 23, 2013, Sycamore assumed RemainCo's

2013 Adjusted EBITDA would be $178 million.  By December 2013, Sycamore assumed that

number would be $189 million.  By February 2014, the calculation increased once again, this

time to $198 million.  The $198 million figure included approximately $60 million in 2013

upward EBITDA adjustments provided by Jones Group management for items like "affiliated

company transactions and transaction costs," "impairments and costs related to previously

announced restructurings," "purchase accounting adjustments," and "other adjustments."

80.     The $198 million in 2013 Adjusted EBITDA that Sycamore used and that

the Directors and Officers included in a March 24, 2014 SEC filing suggested nearly 14% year-

over-year growth from RemainCo's 2012 Adjusted EBITDA, which Sycamore had estimated at

$174 million.  The increase in 2013 Adjusted EBITDA for RemainCo stood in stark contrast to

the more than 11% *decrease* in EBITDA that the whole Jones Group—inclusive of the growing

Carve-Out Businesses—actually experienced from 2012 to 2013.

81.     But even $198 million in Adjusted EBITDA would not come close to

boosting RemainCo's valuation to the level necessary to support the $1.55 billion in debt

RemainCo would be saddled with following the 2014 Transaction.  Therefore, Sycamore took

the $198 million Adjusted EBITDA figure that was already inflated with $60 million of

adjustments created by Jones Group management, and further increased it with $38 million of

speculative adjustments for post-LBO restructuring initiatives, called "Sponsor Addbacks,"

devised by Sycamore.  Even though these future initiatives had not yet been realized, Sycamore

included them as addbacks to historical financial results to produce an even higher Pro Forma

Adjusted EBITDA for 2013 of $236 million.

82.     Sycamore repeatedly referred to the $236 million figure as "Adjusted

EBITDA" and "Historical Adjusted EBITDA" in public filings and presentations to potential

lenders even though its personnel later agreed that it was "misleading" to present this

$236 million figure as historical performance data.

83.     To give a veneer of reliability to these inflated pro forma historical results

for RemainCo, the Directors and Officers caused Jones Group to, among other things, (a) file

with the SEC pro forma financial statements purporting to show how RemainCo would have

performed in 2011-2013 if it had existed as a separate entity, (b) make SEC filings presenting

estimates of RemainCo's pro forma historical EBITDA, which included the $236 million

EBITDA figure calculated by Sycamore, and (c) assist Sycamore in preparing offering

memoranda for RemainCo debt that incorporated the pro forma RemainCo financial statements

and EBITDA estimates.  At the same time, however, buried in a long list of risk factors included

in the offering memoranda was the telling admission that the RemainCo pro forma financial

statements should not be relied on as representative of its financial results had RemainCo

actually existed on a standalone basis; by extension, neither should the EBITDA estimates that

had their starting point in those financials.

## F.     Jones Group Directors and Officers Stand by as Sycamore Prepares Forecasts Inconsistent with Jones Group's Performance

84.     Sycamore's manipulation of the numbers did not stop with the 2013

financials.  It also concocted unreasonable long-range projections for RemainCo.  In particular,

Sycamore projected RemainCo's Pro Forma Adjusted EBITDA would be $244 million in 2014,

$254 million in 2015, $263 million in 2016, $272 million in 2017, and $282 million in 2018, an

increase of 16% in projected EBITDA over four years, when the business's key performance metrics were actually declining. It provided these projections to the valuation firm Duff & Phelps, LLC ("Duff & Phelps") for the purpose of obtaining an opinion on RemainCo's solvency.

85.     Sycamore had ample reason to believe the projections used by Duff & Phelps were unreasonable and unjustified. Just two weeks before the Merger Agreement was signed, Sycamore expressed doubts internally about the viability of one of RemainCo's key brands. In an email dated December 5, 2013, one of Sycamore's principals wrote: "Let's make sure we're taking a step back and thinking through whether we really want to do this. I'd keep thinking about ways we get comfortable NW isn't a doomed brand."

86.     Indeed, during late October 2013 through April 2014, as Sycamore was preparing more and more aggressive 2014 to 2018 projections for RemainCo, Jones Group's own projections were moving in the opposite direction. For example, internal Sycamore documents showed that Jones Group management's projections for the business units that would comprise RemainCo were dropping. In the fourth quarter of 2013, Jones Group's projected sales and gross profit declined by $47 million and $20 million, respectively, relative to its Q4 estimates as of September 2013. The businesses that would comprise RemainCo—Footwear and Jeanswear— accounted for all of the $47 million decline in projected sales and $12 million of the $20 million decline in projected gross profit. The Stuart Weitzman and Kurt Geiger businesses that Sycamore was planning to sell to its affiliates at prices it negotiated with itself, by contrast, were substantially exceeding prior projections and prior year actuals.

87.     In an internal December 2013 presentation, Sycamore admitted that Footwear's fourth quarter 2013 trends were "weak" and "could result in a ~$6M shortfall to plan

on gross margin," and that positive Jeanswear results earlier in the year were "likely not indicative of [the] long-term growth trajectory of the business."  That same month, Sycamore observed that "the entire denim zone is weak."

88.     Similarly worrisome, open orders in the businesses that would comprise RemainCo (*i.e.*, orders placed by wholesale customers that had not yet been filled, which are a leading indicator of revenue) were down from the prior year in every month from April 2013 through March 2014.  In March 2014, for example, open orders were down from the prior year for nearly every one of the major brands that would be part of RemainCo.

89.     On April 4, 2014, a Sycamore team member, after reviewing the most recent Jones Group data, warned that "Q2 bookings continue to suffer across the board" at the businesses that would comprise RemainCo (boldfacing in original):

> Nine West:  "At the end of **Q1 core is -4.6% YoY** [year over year] . . . with overall core sales down $11M YoY . . . ; Q2 continues to look worse at **-16.2% YoY for core ($26M)**"

> Jeanswear:  "**Q2 bookings continue to get worse . . . at -18.4% YoY**"

90.     Jones Group's management in March 2014 projected that 2014 revenues from the Footwear component of RemainCo would decline by 5% as compared to the prior year, and that the Jeanswear component would be flat.  Despite this, Sycamore's projections were based in part on the assumption that the revenues of most of RemainCo's leading Footwear and Jeanswear brands would increase by 2% or 3% per year.

91.     Moreover, Sycamore's projections of increasing revenue were particularly unrealistic because Jones Group's store count had decreased by 99 stores in 2013 and 2014 prior to the 2014 Transaction, and Sycamore intended to close more than 60 additional RemainCo stores, moves with obvious negative impacts on RemainCo's revenue stream.

37

92.     Sycamore's model also assumed the elimination of all 14 members of RemainCo's senior management, which would inevitably have a disruptive effect on RemainCo's operations.

93.     In the first three months of 2014 alone, Jones Group management's annual revenue projections for the businesses that would comprise RemainCo steadily declined from an initial budget of $2,267 million to $2,163 million—almost $30 million less than the $2,192 million assumed in the Sycamore projections given to Duff & Phelps.  Management's initial budget implied a RemainCo 2014 Adjusted EBITDA of $216 million; by March 2014, management lowered its projections to ones that implied an Adjusted EBITDA of $204 million. Prior to the Merger's closing, Sycamore internally acknowledged that even that reduced forecast was "too aggressive."  Based on year-to-date trends, discussions with "many people within Jones," and anticipated sales shortfalls of $80 million in the third and fourth quarters of 2014, Sycamore estimated that RemainCo's 2014 Adjusted EBITDA would actually be as low as $160 million, but suggested that if certain mitigation efforts were taken (to reduce buying and inventory for the fourth quarter), then Adjusted EBITDA of $178 million might be achievable— a far lower number than Sycamore was simultaneously asking Duff & Phelps to use for the purpose of opining on RemainCo's solvency.

94.     Despite Sycamore's recognition—weeks before the 2014 Transaction was to close—that RemainCo would come nowhere close to the projections Sycamore had given Duff & Phelps, Sycamore did nothing to apprise Duff & Phelps or anyone in the outside world of this information.  Instead, Sycamore deliberately kept this bad news under wraps until after the transaction closed.  As Ryan McClendon of Sycamore recommended to Kaluzny and Morrow on

38

March 31: "Given that we are a week away from close, I also do think it would be ok to ignore this for now, and then quickly pick this up post close."

95.     The Directors and Officers received updated reports and projections from Jones Group management on a monthly basis and were therefore aware of the decline in actual and projected performance of the businesses that would comprise RemainCo, and the glowing projections for the performance of the crown jewels that would be sold to Sycamore affiliates.

96.     For example, a financial presentation sent to directors Card, Crotty, Georgiadis, Kamens, Kimmel, Mettler, Mitarotonda, Nuechterlein, Robinson, and Wilkins, and officers Cade, Dansky, Dickson, Fersko, and McClain on January 15, 2014 compared budgeted net sales for 2014 with estimated 2013 results.  It stated: "Emerging brands grow at 14.2%, significantly faster than the recurring base of Core & Category.  Core brands and Category labels grow at combined 1.1%."  More than 80% of the brands in the "emerging brands" category were scheduled to be sold to Sycamore affiliates in the Carve-Out Transactions.

97.     A memorandum entitled "February Financial Performance" that CFO McClain sent to the Jones Group Board on March 20, 2014, with a copy to executives Dansky, Dickson, Cade, and others, showed that net revenues for January and February 2014 were down $41.4 million, or 6.5%, compared to the same period a year earlier.  Most of the decline was attributable to "Domestic Wholesale Jeanswear" ($12.8 million) and "Domestic Wholesale Footwear & Accessories" ($11.5 million)—businesses that were slated to become part of RemainCo.  This wholesale performance decline was in addition to the revenue lost due to the closing of retail stores.

98.     The Directors and Officers knew or were reckless in not knowing that there was a substantial disparity between the forecast Sycamore created for RemainCo and was

39

presenting (with their participation) to rating agencies, Morgan Stanley, and potential lenders and the actual performance and management's projected performance of the businesses that would comprise RemainCo.

99.     The Directors and Officers also ignored the negative effects of Sycamore's planned restructuring—effects that were certain to occur in the short term, if not also in the longer term—when they acquiesced in Sycamore's RemainCo projections for 2014 and later years as well as its calculation of 2013 Pro Forma Adjusted EBITDA and Sponsor Addbacks.

100.     Sycamore unreasonably projected that RemainCo's Pro Forma Adjusted EBITDA would annually increase by 3% or more beginning in 2014.  Sycamore's projections implied increasing Pro Forma Adjusted EBITDA margins between 11.1% and 12.0%, which corresponded to Adjusted EBITDA margins between 10.5% and 11.9%, whereas in the years leading up to the Transaction, RemainCo had failed to achieve Adjusted EBITDA margins greater than 8.9%.

101.     Sycamore also artificially enhanced RemainCo's projected Pro Forma Adjusted EBITDA by understating projected expenses, and overstating expense reimbursements, in a variety of unrealistic or misleading ways.  Sycamore removed *all* C-suite expenses from RemainCo's forecast, even though the company would certainly need to (and did) employ executive leadership at substantial expense post-closing.  Further, RemainCo had agreed that, during a limited transitional period, the Carve-Out Businesses would share use of various corporate services provided by RemainCo (such as information technology, distribution, customer service, finance and accounting, human resources, and legal services) and in return would reimburse an allocated portion of RemainCo's corporate services expenses.  But Sycamore's RemainCo projections assumed that, once the transitional period ended, the

40

corporate services expenses previously allocated to the Carve-Out Businesses would disappear, even though some of those expenses were fixed costs that RemainCo would continue to incur regardless of whether the Carve-Out Businesses were using RemainCo's corporate services or not.  Sycamore's projections also ignored Carve-Out Business Jones Apparel's ongoing office sublease expenses, which would become obligations and expenses of RemainCo after Jones Apparel was divested.  Sycamore also moved $72 million of supposed "one-time" reorganization expenses "below the line" so they would not detract from the projected Pro Forma Adjusted EBITDA that Sycamore had calculated.

102.    At least some of these reorganization expenses, however, were not "one-time" expenses.  For example, Sycamore caused NWHI to engage Alvarez & Marsal as a restructuring adviser and classified that engagement as a one-time restructuring expense.  But Alvarez & Marsal never stopped working at NWHI—indeed, they were still there in 2019.  Pursuant to that engagement, Alvarez & Marsal consultants acted in executive capacities for NWHI from 2014 through 2019.  Because the retention of Alvarez & Marsal was actually a permanent going-forward expense, amounting to millions of dollars per year, it should have been subtracted from Sycamore's calculation of RemainCo's Pro Forma Adjusted EBITDA rather than treated as a one-time item.

## G.    Jones Group's Directors and Officers Fail to Protect the Company When Sycamore Substitutes More Debt for Equity

103.    In a December 19, 2013 Equity Commitment Letter of which Jones Group was an express third-party beneficiary, Sycamore "commit[ted]" to contribute an aggregate of $551 million of equity to the 2014 Transaction, including "such amounts as will satisfy the minimum equity contribution requirements of the Debt Financing Commitments."  In a December 19, 2013 Debt Commitment Letter with NWHI's lenders, Sycamore in turn stated that

41

its "RemainCo Equity Contribution shall be not less than $395 million and shall represent not less than 25% of the pro forma total debt and equity capitalization of the RemainCo Borrower and its subsidiaries after giving effect to the Transactions."  On that basis, the Directors and Officers caused Jones Group to enter into the Merger Agreement on December 19, 2013.

104.    However, Sycamore subsequently reneged on its commitment that its RemainCo equity contribution would be not less than $395 million and would represent not less than 25% of RemainCo's total debt and equity capitalization.  Instead, by the time of the closing of the 2014 Transaction, Sycamore and KKR had reduced their combined RemainCo equity contribution by $275 million, to a mere $120 million, or 8% of RemainCo's total capitalization. Morgan Stanley characterized Sycamore's and KKR's investment as the "LOWEST LBO EQUITY CHECK IN DECADES."  By contrast, Sycamore's and KKR's combined equity commitment for the Carve-Out Businesses ranged from 15% to 34% of total capitalization even though those businesses had higher growth prospects.

105.    Given that the purchase price was not changing, the decrease in the equity contribution corresponded to an increase in the amount of debt incurred by the Company.  As the 2014 Transaction was actually executed, the debt NWHI incurred increased from an originally anticipated amount of $1.206 billion to $1.550 billion.

106.    The Directors and Officers were aware of the significant reduction in Sycamore's equity commitment to RemainCo and the concomitant increase in debt.  Yet they took no action to stop the Merger (or even, at a minimum, assess for themselves the impact on RemainCo's solvency) when Sycamore cut its equity commitment by 70% and increased debt by more than $340 million.

107.     Citigroup had advised the Directors and Officers that, in the context of an LBO where Jones Group *retained* all of its businesses, Jones Group could support total debt equal to 5.1 times its estimated 2013 EBITDA.  The Directors and Officers knew, however, that the 2014 Transaction would *not* retain all of Jones Group's businesses, but instead would *divest* its fastest-growing businesses, thereby reducing RemainCo's ability to service debt.   Even though RemainCo's legacy businesses would be challenged, in Citigroup's words, to sustain "[l]ow single digit growth," the 2014 Transaction did not lessen RemainCo's debt load but instead increased it to a dramatically *higher* multiple of EBITDA.  By contrast, the Carve-Out Businesses—Stuart Weitzman, Kurt Geiger, and Jones Apparel—were capitalized with much less debt and placed outside the reach of RemainCo's creditors.

108.     As a result of the revisions to the 2014 Transaction between December 19, 2013 and the April 8, 2014 closing, NWHI's total debt was 7.8 times the $198 million 2013 Adjusted EBITDA calculated by Jones Group's management and 6.6 times the inflated $236 million 2013 Pro Forma Adjusted EBITDA that Sycamore calculated.  Those multiples were 53% and 29% higher respectively than the 5.1x multiple of EBITDA (adjusted for restructuring cost savings) that Citigroup had told the Directors and Officers the Company could support in a scenario where it retained all of its businesses.  They were also far higher than the multiples of all of the comparable companies Citigroup used as "benchmarks"; those companies' median debt-to-EBITDA multiple was only 0.8 times.

109.     After Jones Group's entry into the Merger Agreement, the Directors and Officers had a continuing legal obligation to make a reasonable, good-faith investigation to determine whether the 2014 Transaction remained in the best interests of Jones Group as the terms of the 2014 Transaction changed in the months between signing and closing.

43

110.     Section 6.2(c) of the Merger Agreement contained a "fiduciary out" provision that allowed the Directors to withdraw their recommendation in favor of the Merger if they determined, after consultation with counsel, that withdrawal "could be required by the directors' fiduciary duties under applicable law."  The Directors had the ongoing obligation to monitor and assess whether the Merger was in Jones Group's best interests and had the ability to change their recommendation upon making such a determination.  Yet, following the signing of the Merger Agreement, the Directors did not make any effort to investigate and determine whether the massive debt incurred by Jones Group in connection with the 2014 Transaction was in the best interests of the Company.

111.     In addition, Section 7.3 of the Merger Agreement conditioned Jones Group's obligation to close the Merger on the truth and correctness of Sycamore's representation and warranty that RemainCo would be solvent after consummation of the LBO and Carve-Out Transactions.  Sycamore's controlled affiliates Jasper Parent LLC and Jasper Merger Sub, Inc. represented and warranted in Section 5.2(k) of the Merger Agreement that "the Surviving Corporation will be Solvent as of the Effective Time and immediately after the consummation of the Merger and the other Transactions," including the Carve-Out Transactions and the LBO Debt (as hereafter defined).  The Directors and Officers did not make any effort, or undertake any reasonable investigation, to determine the truth and correctness of Sycamore's representation about solvency.

112.     Furthermore, Section 8.3(b) of the Merger Agreement provided that the "Agreement may be terminated and the Merger may be abandoned by the Company . . . at any time prior to the Effective Time, if there has been a breach of any representation, warranty, covenant or agreement made by Parent or Merger Sub in this Agreement, or any such

44

representation and warranty shall have become untrue after the date of this Agreement, such that the conditions set forth in Sections 7.3(a) or 7.3(b) would not be satisfied . . . ."

113.   Despite glaring warning signs that the debt load that the Company would incur to finance the LBO was contrary to its best interests and unsustainable, the Directors and Officers made no efforts, reasonable or otherwise, to determine whether the debt that the LBO would place upon RemainCo would render NWHI insolvent, leave it with unreasonably small capital, or render it unable to pay its debts as they came due.  The Directors and Officers made no efforts to engage an expert to render a solvency opinion, assess the truth and accuracy of Sycamore's representation and warranty regarding solvency, or otherwise consider whether the LBO, the Carve-Out Transactions, and the LBO Debt would render NWHI insolvent.

114.   In addition, various of the Directors and Officers knew that NWHI was to receive from Sycamore far less than fair value for the Carve-Out Businesses.  In December 2013, Cade, Dansky, Fersko, and McClain were among those provided with copies of the purchase agreements for the Carve-Out Businesses that disclosed that Sycamore's affiliates planned to pay substantially less for the three Carve-Out Businesses than the more than $800 million Jones Group had paid to acquire Stuart Weitzman and Kurt Geiger alone—businesses that had only increased in value since they were purchased between 2010 and 2012.  In January 2014, Card, Dickson, and McClain were provided with a presentation that showed that Sycamore affiliates planned to pay only $620 million for the Carve-Out Businesses.  In April 2014, Donnalley, Jones Group's Treasurer, signed a Disbursement Authorization Letter in connection with the LBO that contained a "Total Jones Group Sources and Uses Summary," which also disclosed the prices for which the Carve-Out Businesses were being sold.

115. The fact that the Carve-Out Businesses were worth at least their $800 million original purchase price implied that the rest of Jones Group (RemainCo) was worth no more than $1.4 billion—the difference between Sycamore's $2.2 billion purchase price for the entirety of Jones Group and $800 million. That knowledge alone should have alerted reasonable and loyal directors and officers to the need to undertake some investigation into RemainCo's solvency, especially when in February and March 2014 Sycamore arranged for the debt on RemainCo to be increased to $1.46 billion (ultimately $1.55 billion), since it implied that RemainCo likely had a capital deficit. Instead, in breach of their duties of care, loyalty, and good faith, the Directors and Officers did nothing to investigate the Company's solvency, while doing everything they could to advance Sycamore's plans and their own multimillion-dollar payouts.

**H.    Sycamore Withholds Its Lower "Base Case" Projections from Duff & Phelps, and Duff & Phelps Uses Sycamore's Manipulated "Upside" Projections in Its Solvency Opinion**

116. To obtain a solvency opinion for RemainCo in connection with the LBO, in February 2014 Sycamore retained Duff & Phelps, which between 2011 and 2013 had performed nine engagements for Sycamore or its portfolio companies.

117. To prepare an opinion that RemainCo would be solvent after the transaction (the "D&P Solvency Opinion"), Duff & Phelps relied on Sycamore's estimates and projections of RemainCo's Pro Forma Adjusted EBITDA.

118. The D&P Solvency Opinion, rendered on April 4, 2014, was based on the express assumption that "the Management Projections furnished to Duff & Phelps were reasonably prepared and based upon the best currently available information and good faith judgment of the person furnishing the same." Duff & Phelps expressly "[r]elied upon the

46

accuracy, completeness, and fair presentation" of these projections and "did not independently

verify" them.  Duff & Phelps warned that if any of the information it had been asked to assume

proved to be untrue in any material respect, its "Opinion cannot and should not be relied upon."

119.    Sycamore did not prepare these estimates and projections in a good faith

effort to assess RemainCo's future prospects and solvency, but to ensure that Jones Group's total

enterprise value was split between RemainCo and the Carve-Out Businesses in a manner

favorable to Sycamore's investment scheme.

120.    Furthermore, the projections used in the D&P Solvency Opinion were not

Sycamore's "base case" (i.e., most likely) projections, but its "upside" (more optimistic) ones.

Between the time of the Merger Agreement in December 2013 and early March 2014,

Sycamore's base case projected that year-five (*i.e.*, 2018) "exit EBITDA" for RemainCo ranged

from $240 million to $245 million, while its upside case projected a range from $280 million to

$285 million.  Sycamore did not provide Duff & Phelps with its base case projections.  In fact,

the numbers Duff & Phelps used in its solvency analysis fell squarely within Sycamore's *upside*

case.

121.    As the original administrative agent and lead arranger for the Term Loans

(as hereafter defined), Morgan Stanley prepared a model dated April 4, 2014 that included Pro

Forma Adjusted EBITDA projections for RemainCo in a "downside case" (economic downturn)

and in a "base case" (business as usual).  The Morgan Stanley model also had much higher

projections that Morgan Stanley called the "Sycamore case."  The "Sycamore case" projections

were materially identical to the projections Sycamore had supplied to Duff & Phelps for its

solvency opinion.  The chart below compares Morgan Stanley's base case and downside case Pro

Forma Adjusted EBITDA projections (in millions of dollars) with the Sycamore projections that

Duff & Phelps used for its solvency analysis:

| Year | Morgan Stanley | | Sycamore Case |
|---|---|---|---|
| | Downside | Base Case | |
| **2013** | $224 | $224 | $236 |
| **2014** | $154 | $228 | $244 |
| **2015** | $114 | $238 | $254 |
| **2016** | $131 | $247 | $263 |
| **2017** | $140 | $256 | $272 |
| **2018** | $142 | $203 [*sic*] | $282 |

122.    Had Morgan Stanley's downside and base case projections been used in a

solvency analysis, it would have shown that RemainCo would be insolvent by hundreds of

millions of dollars.

123.    The D&P Solvency Opinion was rendered worthless by its use of

Sycamore's manipulated projections.  But even using those projections, Duff & Phelps showed

RemainCo to be perilously close to insolvency and inadequately capitalized.  And numerous

other errors infected Duff & Phelps' analysis, including its use of overstated management

adjustments and Sponsor Addbacks, its inclusion of incorrect time periods in its analysis, and its

use of a weighted average cost of capital that was substantially less than the weighted average

cost of capital Duff & Phelps used in another valuation of RemainCo it prepared for Sycamore as

of the closing date.  Duff & Phelps also used an incorrect amount of closing debt.  Had these

defects been corrected, Duff & Phelps would have found that RemainCo was insolvent.

124.    Plaintiffs have found no evidence that the Directors were aware of the

D&P Solvency Opinion at the time they allowed the 2014 Transaction to proceed.  But even if

they were aware of the D&P Solvency Opinion, it would have been of no consequence, as that

opinion was prepared for Sycamore, not Jones Group, and the opinion stated that it should not be relied upon by anyone other than Sycamore.  Any reliance on the D&P Solvency Opinion would have been unwarranted for the additional reason that, as the Directors knew or should have known, the projections on which the opinion was based were inflated and inconsistent with the other information discussed above.

**I.     A Realistic Analysis Would Have Shown That the 2014 Transaction Would Render NWHI Insolvent**

125.     An honest and realistic analysis of NWHI's solvency would, among other things, have taken into account (a) the first quarter 2014 performance of the businesses that would become NWHI; (b) the problematic economic outlook for the retail industry generally and the brands NWHI was retaining specifically; (c) the likely disruptive effects of the store closings, organizational restructurings, and management changes that Sycamore planned to make; and (d) various errors made by Duff & Phelps.  Such an analysis would have shown that the 2014 Transaction would render NWHI insolvent, with unreasonably small capital, and unable to pay its debts as they came due.

126.     A discounted cash flow analysis that applied reasonable and realistic projections for NWHI would have calculated a total enterprise value for NWHI that was hundreds of millions of dollars less than its debt of $1.55 billion, showing NWHI was insolvent.

127.     A multiples analysis involving comparable companies that applied reasonable and realistic projections for NWHI, and took into account the lower multiples that would be appropriate for RemainCo, would have indicated a total enterprise value of less than $1.55 billion, showing NWHI was insolvent.

128.     Inasmuch as its equity was equal to only 8% of its total capitalization, NWHI had unreasonably small capital.  Companies comparable to NWHI averaged equity equal to approximately 90% of their total capitalization.

129.     Any reasonable projection would have shown that NWHI would generate insufficient cash flow during the period 2014 to 2019 to repay the approximately $1.18 billion of debt that would come due in 2019.  Given its likely financial performance, NWHI would not have the ability to pay this debt when it came due either from its own resources or through capital markets activity.

130.     The Carve-Out Transactions confirm NWHI's insolvency.  Prior to the 2014 Transaction, Jones Group's total enterprise value was approximately $2.2 billion.  The Carve-Out Businesses that Sycamore transferred away represented more than $1 billion of that value.  The value remaining at NWHI was far less than the $1.55 billion in debt piled onto its balance sheet by the 2014 Transaction.

**J.     The 2014 Transaction Closes**

131.     On April 8, 2014, the 2014 Transaction was carried out as a single, integrated transaction with the following components.  Each of the Directors and Officers had knowledge of the multiple component transactions that were part of the 2014 Transaction.  None of the component transactions would have occurred on its own.  Each component transaction was dependent or conditioned on the other components.

132.     *The Mergers*.  Sycamore created a new subsidiary into which Jones Group was merged and ultimately renamed NWHI.  Sycamore did this by having Jasper Merger Sub, Inc., a subsidiary of Jasper Parent LLC (a company previously formed by Sycamore) merge with and into The Jones Group Inc. (with The Jones Group Inc. as the surviving corporation).  At that

time, each share of The Jones Group Inc. was cancelled and converted into the right to receive $15 per share in cash, and Jasper Parent LLC became the owner of all the stock of The Jones Group Inc. through its ownership of Jasper Merger Sub, Inc.  The Jones Group Inc. then went through a series of mergers with its subsidiaries, with the surviving corporation renamed NWHI.

133.    *The Sponsor Equity.*  Sycamore and KKR made an equity investment in NWHI of just $120 million—8% of the $1.55 billion in debt with which NWHI was left after the 2014 Transaction.  Sycamore and KKR made that equity investment through the same funds that owned the Sycamore affiliates that simultaneously acquired the Carve-Out Businesses for hundreds of millions of dollars below the Carve-Out Businesses' value.  Because these affiliates stripped away the Carve-Out Businesses cheaply, the investing funds would profit on a net basis even if RemainCo failed.

134.    *The Additional Debt*.  NWHI incurred $873.8 million of debt, which was used to make part of the more than $1.1 billion payment to Jones Group's former shareholders and to pay financing fees and expenses.  NWHI's borrowings included a $445 million Secured Term Loan and a $300 million Unsecured Term Loan (collectively, the "Term Loans"), and a $128.8 million Asset-Based Loan ("ABL"), $60 million of which was shortly thereafter paid down by issuing $60 million in new 2019 Notes. (The Term Loans and ABL are referred to herein as the "LBO Debt.")  NWHI incurred the obligation to repay the LBO Debt, but it received none of the benefit, as all of the proceeds went directly to Jones Group's former shareholders ($831.4 million) or to pay credit facility fees and expenses ($42.4 million).  In addition to the new LBO Debt incurred, NWHI was burdened with another $655.6 million in existing debt rolled over from Jones Group, including $395.3 million in unsecured notes due 2019, $250 million in unsecured notes due 2034, and $10.3 million in 2016 notes related to the

51

Kurt Geiger business that NWHI was divesting in the 2014 Transaction.  The LBO Debt was granted contractual and/or structural protections—either being secured, or supported by subsidiary guarantees—so that, even in the event of an NWHI bankruptcy, assets would likely be available to pay all or substantially all of the LBO Debt; by contrast, holders of the existing, rolled-over unsecured debt enjoyed no such protection and would receive a recovery only after all the LBO Debt was repaid.

135.   *The Shareholder Transfers*.  NWHI paid Jones Group's shareholders $1.183 billion for their shares.  The payments for Common Shares in the LBO, totaling $1.105 billion, were made by a non-agent contractor that performed the ministerial function of processing share certificates and cash, and whose rights and obligations were governed solely by contract.  The payments made for Restricted Shares, accumulated unpaid dividends on Restricted Shares, and Share Equivalent Units, collectively totaling $78 million, were processed through the payroll and by other means.

136.   *The Carve-Out Transactions*.  As part of the closing of the 2014 Transaction, pursuant to the Merger Agreement and other transaction documents, Sycamore (and its principals Kaluzny and Morrow, who became NWHI's sole directors) caused NWHI to sell the three Carve-Out Businesses—Stuart Weitzman, Kurt Geiger, and Jones Apparel—to newly formed Sycamore affiliates.  The Carve-Out Businesses were collectively worth more than $1 billion at the time (and in fact were resold to third parties for over $1 billion shortly thereafter, even after generating more than $140 million in post-closing dividends to Sycamore and KKR) but were sold in the 2014 Transaction to the Sycamore affiliates for just $641 million ($110 million for Jones Apparel, $395 million for Stuart Weitzman, and $136 million for Kurt Geiger).  About half of the $641 million proceeds from the sale were used to make part of the

52

payment to Jones Group's former shareholders.  The remainder went to paying off Jones Group's 2014 Notes and to transaction fees and expenses.  No material part of the value from the sale of the Carve-Out Businesses to Sycamore affiliates was retained by Jones Group or NWHI.

137.    In addition to incurring the LBO Debt, NWHI retained or refinanced nearly $1 billion in pre-existing Jones Group notes:

a.    Approximately $263 million in pre-LBO unsecured 5.125% notes due in 2014 (the "2014 Notes") were redeemed in full using part of the proceeds from the sale of the Carve-Out Businesses and a payment by Sycamore.

b.    Approximately $400 million in pre-LBO unsecured 6.875% notes due in 2019 (the "Old 2019 Notes") had the option to be redeemed or refinanced due to a change of control provision triggered by the 2014 Transaction.  With access only to misleading information made available to them concerning the value and performance of RemainCo and the Carve-Out Businesses, the holders of approximately $367 million of the Old 2019 Notes exchanged them for newly issued 2019 notes bearing a higher interest rate of 8.25% (the "New 2019 Notes").  (Shortly after the closing, NWHI issued an additional $60 million of New 2019 Notes.)  Holders of approximately $5 million of Old 2019 Notes elected to redeem them, which was done by a payment by Sycamore.  The approximately $28 million of Old 2019 Notes that remained rolled over to NWHI's balance sheet.

c.    Approximately $250 million in pre-LBO unsecured 6.125% notes due in 2034 had no change of control put right, and therefore had no choice but to remain in NWHI's post-LBO, post-Carve-Out Transaction capital structure.

53

138.     The 2014 Transaction resulted in the Company significantly increasing its

debt while having far fewer assets:

| Obligation | Debt (in millions) | |
|---|---|---|
| | Jones Group | NWHI |
| Asset-Based Loan | $   78 | $   69 |
| Secured Term Loan | 0 | 445 |
| Unsecured Term Loan | 0 | 300 |
| 2014 Notes | 263 | 0 |
| 2016 Loan Notes | 10 | 10 |
| Old 2019 Notes | 400 | 28 |
| New 2019 Notes | 0 | 427 |
| 2034 Notes | 250 | 250 |
| Capital Leases | 21 | 21 |
| **Total** | **$1,022** | **$1,550** |

## K.     RemainCo's Disastrous Post-LBO Performance Corroborates the Contemporaneous Evidence That Sycamore's Projections Were Unrealistic and Unreliable

139.     Sycamore's deliberate inflation of the projections it created prior to the

consummation of the LBO is corroborated by RemainCo's post-LBO performance, which never

came close to matching Sycamore's exaggerated forecasts.  For instance, in 2014, RemainCo's

Adjusted EBITDA fell to $178 million—$66 million, or 27%, less than the  $244 million

projection Sycamore had given to Duff & Phelps for its solvency analysis, but consistent with the

$178 million in Adjusted EBITDA that Sycamore had internally estimated shortly before the

2014 Transaction closed.  The disparity between the projections given to Duff & Phelps and

actual performance is starkly illustrated in the chart below:

3525876.2



140.     Other key operating metrics—revenue, gross profit, and operating

income—also dramatically underperformed Sycamore's forecasts in the post-LBO period:



**L.**     **Sycamore Takes Dividends from the Carve-Out Businesses Shortly After Closing and Then Resells the Carve-Out Businesses to Third Parties at Massive Profits**

141.     Soon after it acquired the Carve-Out Businesses at big discounts, Sycamore and KKR began taking more than $140 million in dividends from these businesses, and began marketing them for sale for hundreds of millions of dollars more than the Sponsors paid for them in the 2014 Transaction:

a.     In September 2014, Stuart Weitzman issued $82 million in dividends to Sycamore and KKR.  Then, in January 2015, Sycamore affiliates agreed to sell Stuart Weitzman to a third party (Coach, Inc.) for $549 million, consisting of $531 million in cash plus a contingent earnout then valued at $18 million. The $549 million sales price was $154 million more than the $395 million the Sponsors paid for the same business in the 2014 Transaction.  Including the $82 million in dividends received, the Sponsors' profit was $236 million.

b.     In September 2014, Jones Apparel issued $40 million in dividends to Sycamore and KKR.  Then, in April 2015, Sycamore sold a portion of the Jones Apparel business (namely, the Jones New York intellectual property) to a third party (Authentic Brands Group) in April 2015 for $75 million, leaving behind a business called the Kasper Group ("Kasper").  Sycamore then sold Kasper back to NWHI in January 2017 for $40 million, while retaining $30 million in accounts receivable and $1 million in cash, for total consideration for the entire Jones Apparel Carve-Out Business of $146 million— $36 million more than their $110 million purchase price.  When the $40 million in dividends is included, the Sponsors' profit was $76 million.

c.     In February 2015, Kurt Geiger paid out $22 million to Sycamore and KKR through dividends and share repurchases.  Then, in December 2015, Sycamore sold Kurt

57

Geiger to a third party (Cinven Limited) for $371 million, representing a $235 million premium over the $136 million purchase price paid by Sycamore for the same business in April 2014.  Including the $22 million in dividends, the Sponsors' profit was $257 million.

142.     The Carve-Out Transactions valued the Carve-Out Businesses at $641 million when, by any measure of fair value, they were worth well more than $1 billion (amounts in millions):

| Carve-Out Business | Purchase Consideration | Resale Consideration | Dividends Paid | Total | Under-payment |
|---|---|---|---|---|---|
| Stuart Weitzman | $395 | $549 | $82 | $631 | $236 |
| Jones Apparel | 110 | 146 | 40 | 186 | 76 |
| Kurt Geiger | 136 | 371 | 22 | 393 | 257 |
| **Totals** | **$641** | **$1,066** | **$144** | **$1,210** | **$569** |

143.     As a result of these outsized returns from the Carve-Out Businesses, Sycamore earned a 250% return on its equity investment in the Carve-Out Businesses, and a 108% return on the entire 2014 Transaction, inclusive of its losses from RemainCo.

## M.     Insolvent NWHI Sinks into Bankruptcy

144.     Predictably, the years following the 2014 Transaction were disastrous for NWHI.  In the nine months ended December 31, 2014, NWHI lost $133 million.  It lost $433 million in 2015, $162 million in 2016, and $201 million in 2017.  NWHI lost another $135 million from January 1 to April 7, 2018.  NWHI's total losses from April 2014 to April 2018 were thus $1.064 billion.

145.     NWHI lost an additional $569 million as a result of selling the Carve-Out Businesses for less than their fair market value.

58

146.     NWHI also incurred more than $170 million in interest expense on the LBO Debt from April 8, 2014 to March 20, 2019.

147.     On April 6, 2018, NWHI filed for bankruptcy.

148.     NWHI remained in bankruptcy for almost a year.  During that time, it incurred more than $88 million in fees and expenses for its own and its Official Committee of Unsecured Creditors' attorneys, advisors, and other professionals, as well as more than $30 million of its lenders' professional fees and expenses, and other fees and expenses.

149.     NWHI has been damaged by the conduct of the Directors and Officers in the amount of more than $1 billion.

150.     More than $685 million of the Old 2019 Notes, New 2019 Notes, and 2034 Notes, and more than $130 million of NWHI general unsecured creditor claims, remains unpaid.

151.     As part of the bankruptcy Plan, Sycamore and KKR gave money back to the Debtors' estates in exchange for releases of any claims against them.  The Plan also provided releases for the Sponsors' principals and affiliates, the Term Loan lenders, and NWHI's post-April 8, 2014 directors and officers, among others.  But the Directors, Officers, and the other Shareholder Defendants who collectively received approximately $1.2 billion in the 2014 Transaction were not released and have so far retained the cash they received at the expense of Jones Group's creditors.  They have had the benefit of that cash for more than six years.

152.     The Litigation Trust seeks to recover damages arising from the Directors' and Officers' unlawful conduct alleged herein, and the Litigation Trust and Indenture Trustee seek to recover the Shareholder Transfers and pre- and post-judgment interest, attorneys' fees, costs, and other expenses.

153.    The wrongdoing Directors and Officers fully and completely controlled and dominated Jones Group through April 8, 2014.  After the Merger, in which Jones Group became NWHI, Sycamore managing directors Kaluzny and Morrow, who were also participants in the wrongdoing and initially served as the sole directors of NWHI, fully and completely controlled and dominated NWHI at least until August 2017, when two independent directors of NWHI were appointed.  Thus, until at least August 2017, none of the controlling persons of the corporation, before or after the Merger, could be expected to cause it to bring an action against any of the wrongdoing Directors and Officers since each of them participated in the wrongdoing and their own liability would be implicated in such action.

154.    The statutes of limitations applicable to the claims herein have been tolled at least through the date of filing of this complaint by New York Executive Orders 202.8 (Mar. 7, 2020), 202.14 (Apr. 7, 2020), 202.28 (May 7, 2020), 202.38 (June 6, 2020), and 202.48 (July 6, 2020).

## COUNT I
## Breach of Fiduciary Duty
## (Against Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley)

155.    The Litigation Trust repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

156.    As an officer or director of Jones Group, each of Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley owed fiduciary duties of care and loyalty to Jones Group prior to and in connection with the 2014 Transaction.  Those duties required Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley to act in good faith in a manner reasonably believed to be in the best interests of the corporation.

60

157.    The 2014 Transaction was planned, structured, and consummated as a single integrated transaction comprised of several interdependent and cross-conditional steps, all of which were to be and were executed together, including the Merger, the Shareholder Payments, the Carve-Out Transactions, and the incurrence of the LBO Debt.  Each of those steps depended on the consummation of the others, and none of the steps would have occurred without the occurrence of all the other steps.  Among other things, the Shareholder Payments were made as consideration for the Merger, the funds needed and used to finance the Shareholder Payments were drawn from the proceeds of the LBO Debt, and the Sponsors would not have agreed to the Merger or the Shareholder Payments without the Carve-Out Transactions and the LBO Debt.

158.    Jones Group's Directors and Officers, including Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley, knew that the other steps in the 2014 Transaction would not occur without the Merger (and vice versa), and that approval and consummation of the Merger would result in the consummation of the Shareholder Payments, the Carve-Out Transactions, and the incurrence of the LBO Debt.

159.    Given that consummation of all aspects of the 2014 Transaction was a reasonably foreseeable (and indeed actually foreseen, planned, and intended) consequence of the Merger, in considering whether the Merger was in the best interests of the corporation, Jones Group's Directors and Officers' fiduciary duties required them to consider whether the other parts of the 2014 Transaction, including the Shareholder Payments, the Carve-Out Transactions, and the incurrence of the LBO Debt, were also, individually and collectively, in the best interests of the corporation.  Because the 2014 Transaction was not in the best interests of the corporation, Jones Group's Directors and Officers' fiduciary duties required them not to facilitate the Merger

61

and other aspects of the 2014 Transaction, but to prevent them.  Jones Group's Directors and

Officers, however, failed to fulfill these fiduciary duties.

160.    In the 2014 Transaction, Sycamore acquired Jones Group through the

Merger and, following a series of internal mergers, renamed it NWHI.

161.    Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and

Donnalley advocated for, and Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, and

Robinson approved, the Merger with the knowledge that it could not occur without, and

necessarily meant consummation of, the entire 2014 Transaction, including not only the $15 per

share payment to the Jones Group shareholders, but also the incurrence of the LBO Debt and the

Carve-Out Transactions.

162.    Jones Group's Directors and Officers, including Kimmel, Demsey,

Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley, are liable for the reasonably

foreseeable consequences of their approval and facilitation of the Merger, including the

consummation of the Shareholder Payments, the Carve-Out Transactions, and the LBO Debt,

and the resulting insolvency of the corporation.

163.    The insolvency of NWHI was a reasonably foreseeable consequence of the

2014 Transaction, given that it would result in a corporation with assets having a fair value

hundreds of millions of dollars less than its debts, and the 2014 Transaction in fact did render

NWHI insolvent.  By advocating for and/or approving the Merger, subsequently failing to

consider or make any reasonable investigation as to whether the Board should change its

recommendation in favor of the Merger, (in Kimmel, Demsey, Kamens, Mitarotonda,

Nuechterlein, and Robinson's case) subsequently failing to terminate the Merger Agreement

and/or halt the closing of the Merger, (in Donnalley's case) subsequently failing to recommend

that the Board terminate the Merger Agreement and/or halt the closing of the Merger, or by

failing to act in good faith, Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson,

and Donnalley violated the fiduciary duties that they owed to act in the best interests of Jones

Group.

164.     Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and

Donnalley abdicated their duty to act in good faith in a manner reasonably believed to be in the

best interests of the corporation by advocating for and/or approving a transaction that rendered

the corporation insolvent, with unreasonably small capital, and unable to pay its debts to

creditors, such as the holders of Jones Group's 2034 Notes, which were issued in 2004 and rolled

over to NWHI as part of the 2014 Transaction; Jones Group's 2019 Notes, some of which

remained in place and others of which were issued in connection with the 2014 Transaction; and

Jones Group's trade creditors, some of which (such as landlords) had long-term contracts

predating the LBO.

165.     Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and

Donnalley failed to engage an expert to render a solvency opinion to determine whether the 2014

Transaction would render NWHI insolvent, or to otherwise make any investigation, reasonable

or otherwise, as to the impact of the 2014 Transaction upon NWHI's solvency.  Instead, Kimmel,

Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley knowingly or recklessly

disregarded the 2014 Transaction's consequences.  In advocating for and/or approving the

Merger, (i) Donnalley disregarded the impact, propriety, and fairness of the LBO Debt and the

Carve-Out Transactions with respect to NWHI and its creditors, and (ii) Kimmel, Demsey,

Kamens, Mitarotonda, Nuechterlein, and Robinson purported to disclaim any view as to the

impact, propriety, and fairness of the LBO Debt and the Carve-Out Transactions with respect to

NWHI and its creditors, even though Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley knew that the Merger never would be consummated without the LBO Debt and the Carve-Out Transactions.

166.    Following Jones Group's entry into the Merger Agreement, as the facts regarding the increasing LBO Debt and the Carve-Out Transactions evolved and RemainCo's financial performance deteriorated, (i) Donnalley made no effort to determine the impact of the LBO Debt and the Carve-Out Transactions upon NWHI despite his obligation and ability to recommend that the Board change its recommendation and/or terminate the Merger Agreement and/or refuse to close the Merger if the 2014 Transaction would render NWHI insolvent or was otherwise not in Jones Group's best interests, and (ii) Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, and Robinson made no effort to determine the impact of the LBO Debt and the Carve-Out Transactions upon NWHI despite their obligation and ability to change their recommendation and/or terminate the Merger Agreement and/or refuse to close the Merger if the 2014 Transaction would render NWHI insolvent or was otherwise not in Jones Group's best interests.

167.    All of the Directors and Officers owned shares in Jones Group prior to the approval of the Merger, and received material cash proceeds, in some instances millions of dollars, from the cancellation of their stock in connection with the 2014 Transaction.  They also received additional material rewards from the 2014 Transaction, including accelerated vesting of Restricted Shares that were converted into cash and (in the case of Donnalley and other Officers) Change in Control Payments.  Not only did the Directors' and Officers' interests differ in this respect from Jones Group's other shareholders, they diverged markedly from the interests of Jones Group's creditors, who became the corporation's residual beneficiaries when the 2014

Transaction rendered NWHI insolvent.  Unlike the Directors and Officers, those creditors received no cash payments in the 2014 Transaction, but rather saw their interests subordinated to massive additional debt piled onto a company whose most valuable assets had been stripped away.  Accordingly, the Directors and Officers were interested in, and lacked independence with respect to, the 2014 Transaction.

168.    Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley, acting both individually and collectively with the other Directors and Officers, knowingly or recklessly breached their respective duties of good faith, care, and loyalty, by, among other things:

a.    Acting in their own interests by advocating for and/or approving the Merger Agreement even though they knew that, or recklessly disregarded whether, it would render NWHI insolvent, inadequately capitalized, and unable to pay its debts as they came due;

b.    Succumbing to financial incentives and catering to external influences in advocating for and/or facilitating the 2014 Transaction, which benefitted them but was detrimental to Jones Group and its creditors;

c.    Transferring virtually all of Jones Group's value to its shareholders in an over-levered transaction that rendered NWHI insolvent;

d.    Transferring control of NWHI to Sycamore through the Merger, which the Jones Group Directors and Officers knew required the incurrence of the enormous LBO Debt, and the sale of the Carve-Out Businesses, which divested NWHI of substantial value;

65

e.   Allowing Jones Group's management to materially assist in the syndication of the LBO Debt, thereby assisting Sycamore in raising crippling levels of debt at NWHI;

f.   Failing, in approving the Merger, and in not seeking to have the Board exercise its right to change its recommendation in favor of the Merger and/or terminate the Merger Agreement and/or refuse to close the Merger, to make a reasonable investigation, and to adequately analyze the impact that all of the interdependent parts of the 2014 Transaction would have on NWHI and those Jones Group creditors who would continue to be creditors of NWHI;

g.   Failing, at every stage of the 2014 Transaction, to consider adequately all material facts reasonably available, and willfully or recklessly ignoring the duties they owed to Jones Group to act in the best interests of the corporation;

h.   Failing to urge the Board to exercise its "fiduciary out" and withdraw its recommendation in favor of the Merger;

i.   Failing to seek to have the Board exercise its right to terminate the Merger;

j.   Engaging in self-dealing by leveraging Jones Group's assets to borrow money and otherwise acting to Jones Group's detriment in order to obtain personal gain; and

k.   Furthering the 2014 Transaction for a purpose other than a genuine effort to advance the welfare of Jones Group.

169.   By reason of the foregoing actions, Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley, acting both individually and collectively with the other Directors and Officers, engaged in self-dealing, did not act loyally or in good faith, and breached their fiduciary duties.

66

170.     NWHI has been substantially damaged as a direct and proximate result of the breaches of fiduciary duties by Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley.

171.     The information Jones Group, the Sponsors, and NWHI presented to Jones Group's public shareholders, creditors, and potential lenders concerning its financial prospects at the time of the 2014 Transaction was inflated and covered up the fact of NWHI's insolvency, inadequate capitalization, and inability to pay its debts as they matured.  Thereafter, NWHI was a private company.  It was not until NWHI filed for bankruptcy on April 6, 2018 that NWHI's stakeholders began to receive information that could place them on notice of the breaches of fiduciary duty alleged herein.

172.     Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley are jointly and severally liable, along with all the other Directors and Officers, for the full extent of the harm suffered by NWHI as a result of the 2014 Transaction, including the cost of the Nine West bankruptcy.

173.     Accordingly, the Litigation Trust is entitled to judgment against Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley, jointly and severally, in an amount to be determined at trial, for damages sufficient to compensate NWHI for the full extent of the harm suffered by NWHI as a result of the 2014 Transaction, including the cost of the Nine West bankruptcy, and for disgorgement of any amounts paid to Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley in connection with the 2014 Transaction.

**COUNT II**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Against Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley)**

174.    The Litigation Trust repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

175.    Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley took numerous actions that enabled Kaluzny and Morrow to breach their fiduciary duties once Kaluzny and Morrow became directors of NWHI.  These actions occurred both before Kaluzny and Morrow assumed their director positions—such as by setting in motion the 2014 Transaction—and afterward, by substantially assisting in carrying out the remaining elements of the 2014 Transaction once the Merger took place.  By taking these actions, Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley knowingly participated in and substantially assisted breaches of fiduciary duty by Kaluzny and Morrow and thereby aided and abetted those breaches.

176.    Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley knew that elements of the 2014 Transaction—the Merger, the incurrence of the LBO Debt, the payments to the Jones Group shareholders, and the Carve-Out Transactions—were all intended to occur together, even if some of them occurred at the time the relevant corporation was called The Jones Group and others after it was merged and renamed NWHI.  Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley could not cabin their fiduciary duties by pretending that their role was limited to approving and implementing the Merger, and disclaiming responsibility for all that occurred immediately thereafter.  But even if they could hand off their fiduciary duties to the new directors and new managers of NWHI, they

68

cannot escape the fact that they knowingly participated in and substantially assisted events that facilitated wrongful conduct that they knew would follow once Sycamore took control.

177.    In particular, Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley knew that, or recklessly disregarded whether, the 2014 Transaction would render NWHI insolvent, inadequately capitalized, and unable to pay its debts as they matured.  They also knew that Kaluzny and Morrow were interested in the 2014 Transaction because of their ownership in the Sycamore affiliates that had, prior to the Merger occurring, contracted to buy the Carve-Out Businesses from NWHI at less than fair value.  Because the Carve-Out Transactions would allow Kaluzny and Morrow to profit at NWHI's expense, they would be breaching their fiduciary duties to NWHI in carrying them out.

178.    Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley nevertheless not only advocated for and/or approved the Merger, but agreed to take and took actions to substantially assist Kaluzny and Morrow in their efforts to have NWHI incur the LBO Debt, make the payments to the Jones Group shareholders, and execute the Carve-Out Transactions, all of which were breaches of fiduciary duty by Kaluzny and Morrow.  They thereby knowingly participated in and substantially assisted breaches of fiduciary duty by Kaluzny and Morrow.

179.    NWHI has been substantially damaged as a direct and proximate result of the actions of Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley in aiding and abetting the breaches of fiduciary duties set forth herein.  Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley are jointly and severally liable, along with all the other Directors and Officers, for the full extent of the harm suffered by NWHI.

180.    Accordingly, the Litigation Trust is entitled to judgment against Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley, jointly and severally, in an amount to be determined at trial.

## COUNT III
### Violation of Title 15, Sections 1551 and 1553 of the Pennsylvania Statutes
### (Against Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, and Robinson)

181.    The Litigation Trust repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

182.    Title 15, Section 1551(b) of the Pennsylvania Statutes provides, in relevant part, that "[a] distribution . . . may not be made if, after giving effect thereto: (1) the corporation would be unable to pay its debts as they become due in the usual course of its business; or (2) the total assets of the corporation would be less than the sum of its total liabilities . . . ."

183.    Title 15, Section 1553(a) of the Pennsylvania Statutes provides:

Directors.—Except as otherwise provided pursuant to section 1713 (relating to personal liability of directors), a director who votes for or assents to any dividend or other distribution contrary to the provisions of this subpart or contrary to any restrictions contained in the bylaws shall, if he has not complied with the standard provided in or pursuant to section 1712 (relating to standard of care and justifiable reliance), be liable to the corporation, jointly and severally with all other directors so voting or assenting, for the amount of the dividend that is paid or the value of the other distribution in excess of the amount of the dividend or other distribution that could have been made without a violation of the provisions of this subpart or the restrictions in the bylaws.

184.    The $1.2 billion paid to the Jones Group shareholders in connection with the 2014 Transaction was an unlawful distribution for which the Directors are liable, because after giving effect to the distribution, NWHI was unable to pay its debts as they came due in the usual course of its business, and/or because the total assets of NWHI were less than the sum of its total liabilities.

70

185.     Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, and Robinson voted for or assented to the unlawful distribution.  Their doing so was in breach of their duty of care, was in bad faith, and constituted self-dealing, willful misconduct, or recklessness.  Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, and Robinson are jointly and severally liable, along with all the other Directors, for the full extent of the unlawful distribution.

186.     Accordingly, the Litigation Trust is entitled to judgment against Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, and Robinson in an amount to be determined at trial.

## COUNT IV
## Unjust Enrichment
### (Against Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley)

187.     The Litigation Trust repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

188.     Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley have unjustly retained cash and other things of value that rightly belong to NWHI by virtue of their wrongful acts and omissions, and through the wrongful receipt of payments and distributions relating to the 2014 Transaction.  Retention of those proceeds by Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley violates fundamental principles of justice, equity, and good conscience.

189.     Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley were unjustly enriched as a result of their advocating for and/or approving the Merger.  Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, Donnalley, and their affiliates collectively received more than $7.3 million when their shares were cancelled in

71

connection with the Merger, and Donnalley received at least an additional $1 million in Change in Control Payments resulting from the Merger.

190.    Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley are therefore liable to the Litigation Trust for unjust enrichment.

191.    By virtue of the foregoing, the Litigation Trust is entitled to disgorgement and restitution of, and a judgment against Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley in the amount of, the payments, benefits, incentives, and other things of value Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley received in connection with the 2014 Transaction.

### COUNT V
### Avoidance and Recovery of the Shareholder Transfers
### as Constructive Fraudulent Conveyances
### (Against the Shareholder Defendants)

192.    Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

193.    On or after April 8, 2014, Jones Group's successor NWHI transferred approximately $1.2 billion in cash to Jones Group's former shareholders—including the Shareholder Defendants—in connection with the 2014 Transaction.

194.    NWHI did not receive, and none of the Shareholder Defendants gave, fair consideration or reasonably equivalent value in exchange for these Shareholder Transfers.

195.    At the time the Shareholder Transfers were made or as a result of making the Shareholder Transfers, (a) NWHI was or became insolvent, in that the present fair salable value of NWHI's assets was less than the amount that would have been required to pay NWHI's probable liabilities on its existing debts as they became absolute and matured; (b) NWHI was engaged or was about to engage in a business or transaction for which the property or assets

72

remaining with NWHI after making the Shareholder Transfers was an unreasonably small

capital, or were unreasonably small in relation to the business or transaction; and/or (c) NWHI

intended to incur or believed or reasonably should have believed that it would incur debts

beyond its ability to pay as they matured or became due.

196.    The Shareholder Transfers are voidable under applicable law by creditors

of NWHI holding allowed unsecured claims.

197.    Accordingly, the Shareholder Transfers should be set aside, avoided, and

recovered pursuant to N.Y. DEBT. & CRED. LAW §§ 273, 274, 275, 278, and 279, or other

applicable state law, as applicable pursuant to 11 U.S.C. §§ 544(b)(1) and 550(a) or otherwise.

### COUNT VI
### Avoidance and Recovery of the Shareholder Transfers
### as Intentional Fraudulent Conveyances
### (Against the Shareholder Defendants)

198.    Plaintiffs repeat and reallege each and every allegation in all prior

paragraphs, which are incorporated by reference as if set forth fully herein.

199.    On or after April 8, 2014, Jones Group's successor NWHI transferred

approximately $1.2 billion in cash to Jones Group's former shareholders—including the

Shareholder Defendants—in connection with the 2014 Transaction.

200.    NWHI, by and through its officers, directors, shareholders, and agents,

including the Sponsors, made the Shareholder Transfers with actual intent to hinder, delay, or

defraud its present or future creditors, which intent is demonstrated by, among other things, the

following badges of fraud:

   a.    NWHI did not receive fair consideration or reasonably equivalent value in

        exchange for the Shareholder Transfers;

b.      The Shareholder Transfers were part of the 2014 Transaction that rendered NWHI insolvent, inadequately capitalized, and unable to pay its debts as they matured;

c.      The recipients of the Shareholder Transfers included Jones Group's directors, officers, and other fiduciaries who effectuated the 2014 Transaction and stood to receive millions of dollars from the cancellation of their Jones Group shares and the receipt of additional compensation if the 2014 Transaction was consummated;

d.      The Shareholder Transfers were part of the 2014 Transaction that transferred all or substantially all of the value of NWHI to Jones Group's shareholders, the Sponsors, and the LBO Debt lenders, and away from the pre-LBO creditors of NWHI;

e.      The Shareholder Transfers were part of the 2014 Transaction that the Sponsors intended would enable them to make hundreds of millions of dollars of profits at the expense of NWHI and its creditors;

f.      The Shareholder Transfers were not undertaken in the regular course of Jones Group's or NWHI's business;

g.      The Shareholder Transfers occurred at the same time as, and were made from the proceeds of, the LBO Debt;

h.      The Directors, Officers, and Sponsors advocated for and/or approved the 2014 Transaction notwithstanding that they knew that, or recklessly disregarded whether, the 2014 Transaction would render NWHI insolvent, inadequately capitalized, and unable to pay its debts as they came due;

i.      The Directors, Officers, and Sponsors pursued the 2014 Transaction even though they knew it would involve NWHI incurring unacceptably high levels of debt compared to its projected EBITDA;

j.      The Directors, Officers, and Sponsors pursued the 2014 Transaction even though they knew that the Sponsors had reneged on their previously announced commitment to invest at least $395 million of equity in RemainCo, and were instead investing only $120 million;

k.      Jones Group's management and the Sponsors engaged in deceptive conduct in connection with the 2014 Transaction and the Shareholder Transfers by, among other things, concealing their March 2014 projections from the market, prospective lenders, and Duff & Phelps; and

l.      The Directors, Officers, and Sponsors were aware that the 2014 Transaction involved selling the Carve-Out Businesses at far less than their fair value.

201.    The Shareholder Transfers are voidable under applicable law by creditors of NWHI holding allowed unsecured claims.

202.    Accordingly, the Shareholder Transfers should be set aside, avoided, and recovered pursuant to N.Y. DEBT. & CRED. LAW §§ 276, 278, and 279, or other applicable state law, as applicable pursuant to 11 U.S.C. §§ 544(b)(1) and 550(a) or otherwise.

## COUNT VII
### Avoidance and Recovery of the Change in Control Payments as Constructive and Intentional Fraudulent Conveyances
### (Against the Change in Control Payment Defendants)

203.    Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

204.    The following defendants (the "Change in Control Payment Defendants")

received Change in Control Payments in the following amounts:

| Defendant | Change in Control Payment |
|---|---|
| Joseph T. Donnalley | $1,080,000 |
| Aida Tejero-DeColli | 3,000,000 |
| Frances Lukas | 1,390,500 |
| Gregg Marks | 2,700,000 |
| Gregory Clark | 2,025,000 |
| Heather Roussel | 1,051,140 |
| Janet Carr | 1,275,000 |
| Joseph A. Rosato | 1,119,840 |
| Joseph Stafiniak | 425,000 |
| Kathleen Nedorostek Kaswell | 2,700,000 |
| Larissa Sygida | 1,390,500 |
| Lynne Bernstock | 1,290,795 |
| Mary E. Belle | 1,629,351 |
| Nicoletta Palma | 1,288,995 |
| Norman R. Veit, Jr. | 1,336,860 |
| Scott Bowman | 2,700,000 |
| Sharon Harger | 750,000 |
| Wayne Kulkin | 2,250,000 |

205.    NWHI did not receive fair consideration or reasonably equivalent value

for making the Change in Control Payments.

206.    At the time the Change in Control Payments were made or as a result of

making the Change in Control Payments, NWHI (i) was or became insolvent; (ii) was engaged or

about to engage in a business or a transaction for which NWHI was left with unreasonably small

capital or assets; and/or (iii) intended or believed or reasonably should have believed that it

would incur debts beyond its ability to pay as they matured or became due.

207.    NWHI, by and through certain of its officers, directors, shareholders, and

agents, made the Change in Control Payments with actual intent to hinder, delay, or defraud its

present or future creditors.

76

208.   The Change in Control Payments are voidable under applicable law by creditors of NWHI holding allowed unsecured claims.

209.   Accordingly, the Change in Control Payments should be set aside, avoided, and recovered pursuant to N.Y. DEBT. & CRED. LAW §§ 273, 274, 275, 276, 278, and 279, or other applicable state law, as applicable pursuant to 11 U.S.C. §§ 544(b)(1) and 550(a) or otherwise.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiffs respectfully request that this Court enter judgment against defendants as follows:

(a)   awarding the Litigation Trust damages against, and disgorgement and restitution from, Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley in an amount to be determined at trial;

(b)   setting aside, avoiding, and granting recovery of all Shareholder Transfers paid to the Shareholder Defendants;

(c)   setting aside, avoiding, and granting recovery of the Change in Control Payments paid to the Change in Control Payment Defendants;

(d)   awarding Plaintiffs pre- and post-judgment interest at the maximum rate permitted by law;

(e)   awarding Plaintiffs their attorneys' fees, costs, and other expenses incurred in this action; and

(f)   awarding Plaintiffs such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated:  New York, New York
         July 20, 2020

FRIEDMAN KAPLAN SEILER
   & ADELMAN LLP


s/ Edward A. Friedman
Edward A. Friedman (efriedman@fklaw.com)
Robert J. Lack (rlack@fklaw.com)
Jeffrey C. Fourmaux (jfourmaux@fklaw.com)
Stan Chiueh (schiueh@fklaw.com)
Priyanka Wityk (pwityk@fklaw.com)
7 Times Square
New York, NY 10036-6516
(212) 833-1100

*Attorneys for Plaintiffs*

78